**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RYAN COX AND CYNTHIA LIN, H/W,** | : | |
| **individually and derivatively on behalf of** | : | |
| **ASPIRE AUTISM INC. d/b/a** | : | |
| **ACCLAIM AUTISM** | : | |
| 117 Sora | : | |
| Irvine, CA 92618 | : | CIVIL ACTION NO. |
| | : | |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| **ASPIRE AUTISM INC. d/b/a** | : | |
| **ACCLAIM AUTISM** | : | |
| 1410 N. 31st Street | : | |
| Philadelphia, PA 19121 | : | |
| | : | |
| *and* | : | |
| | : | |
| **JAMIE TURNER** | : | |
| 408 E. Turnberry Court | : | |
| West Chester, PA 19382 | : | |
| | : | |
| *Defendants* | : | |
| | : | |

## <u>CIVIL ACTION COMPLAINT</u>

**AND NOW** Come Plaintiffs, Ryan Cox ("Mr. Cox") and Cynthia Lin ("Mrs. Lin"), husband and wife (collectively "Plaintiffs" or the "Minority Shareholders"), individually and derivatively on behalf of Aspire Autism Inc. d/b/a Acclaim Autism ("Acclaim" or "Company") by and through their undersigned counsel, Kaminsky Law, LLC, and aver as follows in support of their Complaint against Defendants Acclaim and Jamie Turner ("Mr. Turner") (collectively "Defendants"):

## I.    <u>SUMMARY</u>

1. This matter arises from the oppressive and self-dealing conduct of Mr. Turner, the majority shareholder and co-founder of Acclaim, and his conduct in oppressing the Minority

Shareholders of Acclaim, retaliating against them for Mr. Cox exercising his rights as a shareholder and director of the Company, and terminating them without paying all wages that are due to them pursuant to the parties' agreements and subsequent course of conduct.

## II.    PARTIES

2.    Plaintiff, Ryan Cox ("Mr. Cox") is an adult individual residing in Irvine, California. Mr. Cox is a co-founder, 10% shareholder, and since 2024 was the treasurer of Acclaim.

3.    Plaintiff, Cynthia Lin ("Mrs. Lin") is an adult individual residing in Irvine, California. Mrs. Lin is Mr. Cox's wife. Mrs. Lin is officially a 5% shareholder of Acclaim and was promised another 5% interest in Acclaim that was supposed to vest in April 2026.

4.    Defendant Aspire Autism Inc. d/b/a Acclaim Autism ("Acclaim" or the "Company") is a Pennsylvania corporation with a registered business address at 2929 Arch Street, Suite 1700, Philadelphia, PA 19104 and a physical treatment center located at 1410 N. 31st Street, Philadelphia, PA 19121.

5.    Defendant, Jamie Turner ("Mr. Turner") is an adult individual who resides at 408 E. Turnberry Court, West Chester, PA 19382. Mr. Turner is a co-founder and the majority shareholder of Acclaim.

## III.    JURISDICTION, VENUE, AND APPLICABLE LAW

6.    Acclaim is a Pennsylvania corporation, is headquartered in the Commonwealth Pennsylvania, regularly does business in the Commonwealth of Pennsylvania and has a physical location where it provides therapy services in Philadelphia.

7.    Mr. Turner, the majority owner and CEO, resides in the Commonwealth of Pennsylvania.

8.    Accordingly, this Court has personal jurisdiction over the Defendants pursuant to 42 Pa. C.S. § 5322.

2

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as Plaintiffs' damages exceed $75,000.00 and there is complete diversity of the parties.

10. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C § 1391 because Acclaim is registered and physically located in the district.

11. Acclaim is a Pennsylvania corporation that operates under the Pennsylvania Business Corporation Law ("BCL"), 15 Pa. C.S. § 1101, et seq.

12. Accordingly, the BCL applies to Plaintiffs' rights as shareholders of Acclaim.

13. At all times material hereto, Acclaim was a closely held corporation as defined by the BCL and applicable Pennsylvania jurisprudence.

14. At all times material hereto, Plaintiffs were California residents and worked for Acclaim from California.

15. Accordingly, the California Labor Code ("CLC"), Ca. Lab. Code. § 201, *et seq*. applies to Plaintiffs' employment for Acclaim, the wages they are owed from Acclaim, and their rights as employees of Acclaim.

## IV.  FACTS COMMON TO ALL COUNTS

### Background

16. Acclaim is a Philadelphia-based behavioral healthcare company founded in 2019 that provides evidence-based Applied Behavior Analysis (ABA) therapy for children under 21 with Autism Spectrum Disorder (ASD).

17. Acclaim offers in-home, school-based, and clinic-based services, including early intervention, social skills groups, and caregiver training, with locations in Pennsylvania and other states—including California.

18. Mr. Cox joined Mr. Turner in summer 2019 to help develop the Company. He initially worked without salary, providing strategic, financial, and operational support with the

clear understanding that he would receive employment with the Company and equity participation in the future.

19.    In April 2020, Mr. Cox entered into a "Part-Time Employment Agreement" with Acclaim (the "2020 Agreement") to provide "administrative and consulting services". *See* the Agreement attached hereto as **Exhibit A**.

20.    Mr. Cox's only consideration under the 2020 Agreement was ten percent of profits, two weeks paid time off annually, and, following the second anniversary of the 2020 Agreement, a 10% ownership interest in the Company—in exchange for at least ten hours per week of work for the Company. *See* Ex. A, at ¶¶ 3(a), 3(b), 4(a).

21.    In October 2021, after more than two (2) years of unpaid work, Mr. Cox began receiving a modest salary of approximately $50,000.00 annually.

22.    Although Mr. Turner regularly referred to Mr. Cox as a director of the Company, in February 2024, Mr. Cox was officially elected to be the Treasurer of Acclaim. This role expanded his responsibilities to include financial oversight and active participation in corporate decision-making.

23.    By the end of 2024, Mr. Cox held a key role within Acclaim, which included but were not limited to:

    a.    Interviewing and vetting clinical and operational staff;

    b.    Reviewing and corresponding with payors;

    c.    Developing Acclaim Training, the training platform for Acclaim and other providers;

    d.    Overseeing a turnaround operation that made center-based services in Philadelphia profitable for the first time, after months of losses;

    e.    Overseeing key projects for asset development and growth; and

f. Overseeing the development of technology that has won innovation awards and demonstrably increased revenues for the Company.

24. He also oversaw Acclaim's marketing department, which he managed for public relations, brand visibility, and technology positioning.

25. Mr. Cox was also involved in spin-off planning for Xelen, the internal name for a planned spin-off of Acclaim's operational technology assets.

26. Mrs. Lin joined Acclaim in December of 2021 and was similarly granted five percent (5%) equity in Acclaim, and was promised an additional five percent (5%) as detailed more fully below.

**Liberty BPO**

27. In December 2021, Mr. Turner founded Liberty BPO, a company based in the Philippines believed to be mostly owned by him to provide offshore administrative services to Acclaim and other companies in the field.[1]

28. Upon information and belief, Liberty BPO also provided services to Mr. Turner's other business ventures as well as the business ventures of his wife, Qilin Xu ("Mrs. Xu").

29. In mid-2025, Mr. Cox discovered that payments made to Liberty BPO were made without invoice(s) and without commensurate work to support them.

30. Specifically, he learned that expensive software licenses were being used by Liberty BPO but allocated to spending on Acclaim's technology—a department that Mr. Cox oversaw.

31. When Mr. Cox began to seek information about the spending, Mr. Turner refused to provide specifics or invoices. In fact, Acclaim's counsel subsequently described money

---

[1] Upon information and belief, Vanessa Radaza nee Potencio, a local Philippine citizen owns a small stake, for regulatory purposes.

5

transfers from Acclaim to Liberty BPO occurring based on emails "from a payroll vendor in the Philippines, landlord, or the Senior Manager requesting funds for specific things."

32. Further, payments to Liberty BPO drastically increased in both frequency and amount.

33. Upon information and belief, based on Mr. Turner's own statements to Mr. Cox, Liberty BPO had approximately twelve (12) to fourteen (14) employees, each making approximately $1,000 per month, whose *combined* monthly salaries should not exceed $20,000.00.

34. However, for several months, in 2025, the Company made substantially higher monthly payments to Liberty BPO, often approaching $30,000.00 and in some cases as high as $40,000.00 – which was over 50% more than the estimated cost for staff as represented by Mr. Turner.

35. Separately, upon information and belief, Acclaim paid for Liberty BPO's overhead, including but not limited to, software, hardware, rent, furniture, etc., while also running expenses for certain software through Acclaim, further inflating costs.

36. Plaintiffs reasonably believe that these excess payments are either for work done for entities other than Acclaim (such as Happy Smiles at Columbia PLLC, a company owned by Mr. Turner's wife, and his real estate holdings), or a method for Mr. Turner to take distributions from Acclaim without making commensurate distributions to the Minority Shareholders.

37. Similarly, based on the available records, it is the Minority Shareholders' reasonable belief that various costs are not properly allocated to the company to which they apply and are instead all paid by Acclaim.

38.     Accordingly, Plaintiffs reasonably believe that Mr. Turner used Liberty BPO to siphon money from Acclaim, that such conduct was improper, and constitutes misappropriation as well as a breach of Mr. Turner's fiduciary duty to Acclaim.

### Mr. Cox's Inquiries, Concerns, and Objections

39.     By late 2025, Mr. Cox became more vocal about his concerns, asking questions about Acclaim's spending, finances, related-party transactions, Liberty BPO, and audits about which Mr. Cox was previously unaware—and objecting to conduct that he reasonably believed to be against the Company's best interests.

40.     Mr. Cox repeatedly sought details about Acclaim's operation and expenses, but was told that he had access to the records, that the Company would not create records that did not exist in the ordinary course of business, and that, as a result, no additional records would be provided by the Company other than those that he could access himself.

41.     Based on a review of the records available to Mr. Cox, there was minimal, if any, detail or clarity regarding Acclaim's expenses, loans, and/or large payments to Liberty BPO and other entities / accounts.

42.     Further, Mr. Cox discovered that the 2023 and 2024 tax returns do not identify Mr. Cox or Mrs. Lin as shareholders and instead misrepresent Mr. Turner as 100% owner of Acclaim. *See* Relevant Portions of the 2023 and 2024 Tax Returns attached hereto as **Exhibit B**.

43.     Upon information and belief, the same incorrect ownership mischaracterization was submitted in multiple loan applications.

44.     After Mr. Cox began to raise these concerns, Mr. Turner began cancelling weekly meetings with Mr. Cox and ceased sharing details about the Company's operations.

45.     By September / October of 2025, Mr. Cox's role, duties, and access were drastically limited.

46. Specifically, Mr. Cox's access to file systems, credit accounts, and other systems that Mr. Cox previously oversaw were restricted.

47. Similarly, Mr. Cox's direct reports were redirected to report to individuals other than Mr. Cox.

48. Further, Mr. Turner attempted to pigeonhole Mr. Cox into working only on Xelen under the guise that Acclaim needed to get his compensation "off the books" – in direct contradiction of Mr. Turner's prior promise to give Mr. Cox a raise to $180,000 per year.

49. Mrs. Lin's access was also restricted "out of an abundance of caution."

50. These restrictions were in direct response to, and in obvious retaliation for, Mr. Cox's questioning and skepticism of Acclaim's finances and objection to Mr. Turner's outsized payments to Liberty BPO.

51. It is Plaintiffs' position that, at all times material hereto, Mr. Cox was a member of the board of directors of Acclaim and both Mr. Cox and Mrs. Lin are shareholders. Therefore, restricting such access in response to Mr. Cox's inquiries and requests for information was improper, retaliatory, and a breach of Mr. Turner's fiduciary duties to Acclaim and the Minority Shareholders.

## Demand for Corporate Records and Investigation

52. Based on Plaintiffs' concerns and suspicions regarding Mr. Turner's conduct, on November 6, 2025, Plaintiffs, via counsel, served a 15 Pa. C.S. § 1508 demand for corporate records to Acclaim and Mr. Turner personally (the "1508 Demand"). *See* the 1508 Demand attached hereto as **Exhibit C**.

53. In their 1508 Demand, Plaintiffs sought, among other things: Acclaim's agreements; meeting minutes and/or consents in lieu of meetings; records evidencing the Company's loans; information about the Company's affiliates, subsidiaries, and/or related entities;

audit correspondence; Liberty BPO invoices; and various other financial and QuickBooks records evidencing the Company's business dealings. *See* Ex. C.

54.     Upon review of the documents available to the Minority Shareholders and/or produced by the Company in response to the 1508 Demand, several issues concerning Acclaim's business were discovered.

55.     At the outset, it was confirmed that Acclaim's SBA and IRS filings do not accurately reflect the Minority Shareholders' ownership of the Company.

56.     Moreover, at least one set of filing documents for an Acclaim subsidiary contained signatures purporting to belong to Mr. Cox and Mrs. Lin, which were not actually the Minority Shareholders' signatures—and appear to have been forged. *See* Filings with Forged Signatures attached hereto as **Exhibit D**.

57.     Further, while taking the position that the business is experiencing "cash flow challenges" since receiving the Minority Shareholders' Demand, it appears that Mr. Turner, withdrew in excess of $150,000.00 from the Company's accounts under the guise that the Company was now on "better financial footing" – in direct contradiction to his relying on a "lack of finances" to terminate Mr. Cox, as detailed more fully below.

58.     The withdrawals included a repayment of a $40,000.00 "loan" to himself and a transfer of $51,000.00 to an unknown checking account.

59.     Perhaps most alarmingly, since the 1508 Demand, as of November 2025, the Company's cash balance declined from approximately $343,000.00 to approximately $33,000.00.

60.     In fact, it appears that the claimed "cash flow challenges" are self-inflicted and result solely from Mr. Turner's conduct.

61.     In fact, as detailed above, payments to Liberty BPO increased while other contractors went unpaid.

62. The Minority Shareholders believe that the above conduct constitutes a breach of Mr. Turner's fiduciary duty to the Company and its shareholders.

63. It is the Minority Shareholders' position that, in addition to a potential breach of fiduciary duty, these financial improprieties have a material and adverse impact on the Company's continued viability and the value of the Minority Shareholders' interests.

64. Based on these discoveries, on November 28, 2025, the Minority Shareholders made a formal demand on the Company to pursue various actions, including but not limited to:

   a. Identify and correct any and all documents that were incorrectly or improperly filed with any governmental agency, expressly including the SBA and IRS;

   b. Perform an independent third-party accounting;

   c. Pursue the recovery of any funds determined to be made without proper corresponding invoice, improperly expended, and/or misappropriated; and

   d. Mr. Turner to maintain status quo and cease and desist from engaging in any arguably self-interested transactions or conduct.

*See* the Shareholder Demand attached hereto as **Exhibit E**.

65. Further, the Minority Shareholders' insisted that any accounting or review be performed by a third-party accountant because, it is their understanding that James Kennedy, Acclaim's accountant, and Matthew McGrath, VP of Finance for Acclaim, have or had a financial interest in Acclaim and/or have loaned Acclaim funds in the past and permitted the above financial improprieties to persist. *See* Ex. E.

### **Mr. Turner's retaliatory conduct**

66. As set forth above, shortly after and in direct response to Mr. Cox's vocality about Mr. Turner's conduct, Mr. Turner began actively retaliating not only against Mr. Cox, but also against his wife, Mrs. Lin.

10

67.     Mr. Turner began removing board meeting calendar invites from Mr. Cox's calendar and started taking corporate actions, engaging counsel, and making major business decisions without consulting the board and/or Mr. Cox.

68.     Upon information and belief, Mr. Turner also embarked on a campaign of false and defamatory statements about Mr. Cox (and potentially Mrs. Lin) to convince employees to ignore his position, inquiries, and directives.

69.     Further, Mr. Turner attempted to shift Mr. Cox to Xelen and demanded that he raise funds for Xelen.

70.     However, for the reasons set forth above—including the lack of transparency into Acclaim's finances and dealings—Mr. Turner made it clear that Xelen most likely could not raise funds while Acclaim remains an investor and/or owner.

71.     Mr. Turner then assigned Mr. Cox tasks and directives that he had not performed in years—which Mr. Cox completed—in a blatant effort to divert his attention from overseeing the Company's finances.

72.     On January 23, 2026, two (2) days before the deliverables' due date, Acclaim terminated Mr. Cox's employment, referencing Section 2(a) of the Agreement.[2] *See* Termination Notice attached hereto as **Exhibit F**.

73.     The termination was to be effective April 30, 2026, "at the end of the current term" of the 2020 Agreement, without cause, made no reference to any performance issues, and was clearly in retaliation for Mr. Cox enforcing his rights as a shareholder.

---

[2] Mr. Cox prepared the deliverables and forwarded them internally; those documents remain in the draft folder of his work email account, to which he no longer has access following the termination.

74.     When Mr. Cox sought that the Company pay his regular salary and benefits through April 30, 2026, the demand was rejected on the basis that the 2020 Agreement only provided for a 10% profit share and no salary.

75.     However, through the parties' course of dealing and subsequent writings, including multiple raises, paystubs, W-2s, and communications, the 2020 Agreement was modified with respect to Mr. Cox's duties and compensation.

76.     Moreover, when his original shareholder interests vested and he became a 10% owner of Acclaim, the original 10% profit-sharing provision ceased to constitute compensation under the Agreement, became Mr. Cox's right as a shareholder, and he began receiving an annual salary.

77.     Mr. Cox's annual salary progressively increased from $50,000.00 in 2021 to $80,000.00 in June 2022, $100,000.00 in September 2022, $130,000.00 in April 2023, and $155,000.00 in June 2024, plus benefits.

78.     He also became a full-time employee, took on other duties and responsibilities, and was promoted to Vice President after being lauded by Mr. Turner.

79.     Accordingly, Mr. Cox is owed—at a minimum—wages and employment benefits through April 30, 2026.

80.     With respect to Mrs. Lin, although she has not personally raised any issues or concerns as a shareholder, Mr. Turner also revoked her access, limited her duties and redirected her direct reports.

81.    Mrs. Lin similarly started with Acclaim in December of 2021, part time at a rate of thirty dollars ($30) per hour, with a promise of five percent (5%) interest in Acclaim to vest in June of 2024.[3] See Employment Agreement attached hereto as **Exhibit G**.

82.    Mrs. Lin's salary progressed to $80,000.00 in June 2022, $100,000.00 in September 2022, $130,000.00 in April 2023, and $155,000.00 in June 2024, plus benefits.

83.    Mrs. Lin was also verbally promised an additional five percent (5%) to vest in April of 2026.

84.    Initially the additional five percent (5%) was based solely on Mrs. Lin continuing to be employed by Acclaim and pursuing center-based services in California.

85.    Mr. Turner reiterated that promise to Mrs. Lin on October 3, 2025 in a weekly meeting.

86.    However, after Mr. Cox made his formal demands in November of 2025, and the dispute escalated, in March of 2026, Mr. Turner moved the goalposts and imposed arbitrary targets and conditions that Mrs. Lin had to satisfy to receive the five percent (5%). *See* Correspondence attached hereto as **Exhibit H**.

87.    Mrs. Lin pushed back on the new targets and the fact that they would be unachievable due to Acclaim's failure to provide the previously committed resources to California.

88.    In fact, around this time, Mr. Turner began to wind down the California office where Mrs. Lin was employed and caused the Company to cease paying rent – without notice to Mrs. Lin.

89.    Tellingly, in March of 2026, Mr. Turner also manufactured a protected health information ("PHI") issue by refusing to make rent payments for the California office, while

---

[3] Mr. Turner actually transferred the five percent (5%) interest in Acclaim to Mrs. Lin in February of 2024.

expressing concern that access to the physical files in the California office could be restricted and demanding that they be immediately secured and protected – all of which he attempted to blame on Mrs. Lin, as an obvious pretext to justify terminating her. *See* Correspondence attached hereto as **Exhibit I**.

90.     Mr. Turner's conduct was a thinly veiled effort to position the Minority Shareholders' conduct as insubordination or necessitated by the Company's financial position, when it is obvious that it is solely in response to Mr. Cox's attempts to ensure the Company is financially sound and to inquire about expenses and expenditures that Mr. Cox reasonably believes to be improper.

91.     Notably, just a few months before Mr. Cox raised any issues, Mr. Turner praised Mr. Cox's performance and promised both him and Mrs. Lin a raise.

92.     Moreover, while making his inquiries, Mr. Cox was still on the Company's board of directors and was not removed by shareholder vote or otherwise.

93.     However, when Mr. Cox attempted to email the HR department to inquire about his salary and benefits payments, he discovered that his personal email was being blocked by Acclaim's email server.

94.     Similarly, Mrs. Lin was excluded from her prior scheduled meetings and her duties for the Company and direct reports were drastically reduced.

95.     Such conduct was clearly aimed at preventing them from getting information, making their position heard, enforcing their rights as shareholders, and/or corresponding with individuals who have access to relevant information.

96.     Mr. Turner's conduct is in violation of applicable California employment law, shareholder oppression, and a breach of fiduciary duty to the Minority Shareholders and the Company.

14

**2026 Shareholder Meetings**

97.    On April 17, 2026, the Minority Shareholders received a response to their demand that Acclaim review all Liberty BPO transactions for propriety.[4]

98.    However, the analysis was performed internally, based on limited information, and does not appear based on any real analysis tied to performance or outcomes for the Company.

99.    The analysis is self-serving, based on Mr. Turner's input, and none of the key issues about underperformance, financial commingling, self-dealing, or funding other businesses with Acclaim funds were substantively addressed.

100.    Moreover, the Minority Shareholders were not provided with any opportunity or ability to raise concerns to those conducting the analysis.

101.    This further supports the Minority Shareholders' demand that an independent third-party perform the analysis.

102.    Also on April 17, 2026, the Minority Shareholders received notice of the Annual Shareholder Meeting scheduled for April 28, 2026, to discuss and vote on new Bylaws and a new Shareholder Agreement. *See* Notice Attached hereto as **Exhibit J**.

103.    However, the proposed shareholder agreement (the "Proposed SA") sought to impose new terms and restrictions on the Minority Shareholders' shares that were never discussed, proposed, or agreed upon at the time the Minority Shareholders' shares were issued and granted to them.

104.    On April 27, 2026, the Minority Shareholders put the Company and Mr. Turner on notice of their objection and the basis therefor. *See* Minority Shareholder Correspondence attached hereto as **Exhibit K**.

---

[4] The analysis is omitted as it may arguably contain confidential and/or trade secret information.

15

105.     By way of limited example only, Section 3(B)(iii) of the Proposed SA would require Mr. Cox, who has already been terminated from the Company, without cause, to offer his shares for sale to the Company.

106.     In fact, pursuant to Section 3(E)(i) of the Proposed SA, Mr. Cox would forfeit his shares to the Company "zero dollars ($0)" irrespective of the fact that he was terminated without cause.

107.     Further, Section 5 of the Proposed SA sought to ratify the unresolved dispute about Mr. Cox' improper removal from the board of directors.

108.     The proposed bylaws also sought to eliminate the checks and balances that the Minority Shareholders had on transactions in which a shareholder—namely Mr. Turner—was interested.

109.     Taken as a whole, such proposed modifications are another thinly veiled attempt to oppress the Minority Shareholders and their rights as shareholders in a closely held company.

110.     In response to their objection, the Company postponed the vote on the Proposed SA and new bylaws, but the intent to deprive the Minority Shareholders of their interests and rights as shareholders is self-evident.

111.     To the best of the Minority Shareholders' knowledge, no subsequent meetings occurred and a vote has not been conducted on the new bylaws or Proposed SA.

### Mrs. Lin's Termination

112.     After the shareholder meeting and although Mrs. Lin complied with Mr. Turner's pretextual PHI demands, she was still terminated.

113.     Specifically, on May 19, 2026, Mr. Turner terminated Mrs. Lin, effective December 15, 2026, pursuant to Section 2(a) of her employment agreement, without cause. *See* May 19, 2026 Correspondence attached hereto as **Exhibit L**; *see also* Ex. G.

16

114.    Notably, although the termination is effective December 15, 2026 – i.e. at the end of her employment Term – the termination notice makes no effort to pay her the salary and other benefits she is due through the end of the Term. *See* Ex. L, Ex. G.

115.    Mrs. Lin's termination was in clear and obvious retaliation for Mr. Cox voicing his concerns with Acclaim's spending and the parties exercising their rights as shareholders.

116.    Further, Acclaim – and specifically Mr. Turner's – refusal to pay both Mr. Cox and Mrs. Lin their wages through the end of their employment terms is in breach of applicable wage laws.

**Piercing the Corporate Veil**

117.    Upon information and belief, Mr. Turner has abused the corporate form of Acclaim by treating it as Liberty BPO's personal alter ego rather than a separate legal entity.

118.    Upon information and belief, Mr. Turner has comingled Acclaim's funds and the funds and expenses of Liberty BPO—a Philippine company in which the Minority Shareholders do not have interests.

119.    Payments to Liberty BPO have been made without invoices or any demonstrable business purpose, have escalated dramatically and irregularly, and have far exceeded any legitimate administrative costs.

120.    These excess transfers, together with cash withdrawals of over $150,000.00 from Acclaim's accounts shortly after Mr. Cox began identifying issues with Acclaim's finances— including repayment of a purported "loan" to himself and a transfer to an unknown account—have reduced Acclaim's cash from approximately $343,000.00 to $33,000.00 in a matter of weeks.

121.    Such pervasive commingling of funds and expenses between Acclaim, Liberty BPO, and Mr. Turner's personal finances demonstrates that Acclaim is merely an instrumentality through which Mr. Turner conducts his own affairs.

17

122. Further, Mr. Turner has caused Acclaim to file tax returns and SBA loan applications that falsely represented him as the 100% owner and omitted Mr. Cox's 10% ownership interest and Mrs. Lin's 5% ownership interest entirely.

123. Mr. Turner also forged the Minority Shareholders' signatures to be placed on official documents.

124. These acts, combined with the retaliatory termination of Mr. Cox, restriction of Mrs. Lin's access, and ultimate termination of Mrs. Lin, immediately after Mr. Cox raised legitimate questions about these very transactions, constitute an abuse of the corporate privilege.

125. Maintaining the corporate veil under these circumstances would encourage unlawful conduct and inequitable result that would potentially leave the Minority Shareholders without recourse for Mr. Turner's wrongful conduct—especially if Mr. Turner's conduct ultimately causes Acclaim to be insolvent.

126. Further, Mr. Turner's decision not to pay Mr. Cox and/or Mrs. Lin their owed wages and benefits through the end of their employment term justifies holding him personally liable under applicable law.

127. Accordingly, with respect to the claims brought against Acclaim, its corporate veil should be pierced, and Mr. Turner should be held personally, jointly, and severally liable for any and all damages awarded to the Plaintiffs against Acclaim.

## COUNT I
### (Wage Claim Pursuant to California Labor Code)
### PLAINTIFF COX v. ALL DEFENDANTS

128. Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

129. At all times material hereto, Defendant Acclaim was Plaintiff Cox's employer.

18

130. As used in California Labor Code, "wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation. Cal. Lab Code § 200.

131. Courts have recognized that "wages" also include those benefits to which an employee is entitled as a part of his or her compensation, including money, room, board, clothing, vacation pay, and sick pay. *See e.g.*, *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 780 183 Cal. Rptr. 846, 647 P.2d 122; *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1091, 64 Cal. Rptr. 2d 457.

132. "Labor" includes labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment. Cal. Lab Code § 200.

133. Mr. Cox's annual salary progressively increased from $50,000.00 in 2021 to $80,000.00 in June 2022, $100,000.00 in September 2022, $130,000.00 in April 2023, and $155,000.00 in June 2024, plus benefits.

134. He also became a full-time employee, took on other duties and responsibilities, and was promoted to Vice President after being lauded by Mr. Turner.

135. Accordingly, Mr. Cox's wages included his annual salary of $155,000.00 plus benefits, which the parties established through their course of dealing, multiple raises, paystubs, W-2s, and other written communications after the original 2020 Agreement.

136. On January 23, 2026, Acclaim terminated Mr. Cox's employment, referencing Section 2(a) of the Agreement.

19

137. The termination was to be effective April 30, 2026, "at the end of the current term" of the 2020 Agreement, without cause, made no reference to any performance issues, and was clearly in retaliation for Mr. Cox enforcing his rights as a shareholder.

138. If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately. Cal. Lab Code § 201.

139. When Mr. Cox sought that the Company pay his regular salary and benefits through April 30, 2026, the demand was rejected on baseless claim that the 2020 Agreement only provided for a 10% profit share and no salary, and in clear disregard of the fact that the parties modified their agreement over the years by their course of conduct.

140. Further, the Company only paid Mr. Cox approximately half of his accrued paid time off and deleted the remaining accumulated balance.

141. Despite this clear obligation under California law, Acclaim failed to pay Mr. Cox the full wages and benefits owed to him at the time of his termination and has continued to withhold those amounts.

142. As a direct result of Acclaim's willful failure to pay the wages and benefits owed to Mr. Cox at the time of his discharge, Mr. Cox has suffered damages in the amount of his unpaid salary, benefits, and related amounts.

143. Mr. Cox is entitled to recover all unpaid wages owed from the date of discharge through April 30, 2026, together with penalties as provided by California Labor Code.

144. Accordingly, Defendant Acclaim's conduct violates the California Labor Code, and Mr. Cox is entitled to recover all unpaid wages, waiting-time penalties, and such other relief as may be available under California law.

145. If an employer willfully fails to pay, without abatement or reduction, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty

20

from the due date thereof at the same rate until paid or until an action therefor is commenced, but the wages shall not continue for more than 30 days. Cal. Lab Code § 203.

146. Accordingly, pursuant to the California Labor Code, Mr. Cox's wages are due from January 24, 2026 through May 30, 2026 at a rate of $155,000 per year (totaling approximately $52,000), plus all unused and unpaid PTO (totaling approximately $3,000). However, because Defendants deleted the accumulated balance, Mr. Cox is unable to determine the correct amount for the benefits due to him.

147. Additionally, California provides for the recovery of reasonable attorney's fees and costs to the prevailing party "[i]n any action brought for the nonpayment of wages [and] fringe benefits." Cal. Lab Code § 218.5.

148. Further, pursuant to California's Labor Code, "the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code [10%], which shall accrue from the date that the wages were due and payable." Cal. Lab Code § 218.6.

149. Finally, California's Labor Code provides that an owner, director, officer, or managing agent who fails to pay wages that are due can be held personally liable for the same. Cal. Lab Code § 558.1.

150. Defendants' decision not to pay Mr. Cox his salary and benefits was done knowingly, willfully, and in clear disregard of applicable law, justifying holding Mr. Turner personally liable for his participation and imposing all applicable penalties.

151. Accordingly, Mr. Turner should be held personally liable for all wages due and all interest and penalties thereon.

**WHEREFORE**, Plaintiff Mr. Cox demands judgment in his favor and against Defendants Acclaim and Mr. Turner, for an amount exceeding $75,000, finding Defendants Acclaim and Mr.

21

Turner liable for violating California Labor Code against Plaintiff Mr. Cox, plus an award of pre- and post judgement interest at a rate of 10%, attorney's fees, penalties, and any such other relief this Court deems equitable and just.

## COUNT II
### (Wage Claim Pursuant to California Labor Code)
### PLAINTIFF LIN v. ALL DEFENDANTS

152.    Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

153.    At all times material hereto, Defendant Acclaim was Plaintiff Lin's employer.

154.    As defined above, Mrs. Lin's wages included her annual salary plus benefits, which the parties established through their course of dealing, raises, paystubs, W-2s, and other written communications during her employment with Acclaim.

155.    On May 19, 2026, Acclaim terminated Mrs. Lin's employment pursuant to Section 2(a) of her employment agreement, effective December 15, 2026, without cause.

156.    However, neither the Company nor Mr. Turner made any effort to pay Mrs. Lin her wages through December 15, 2026.

157.    Similarly, Mrs. Lin was not paid her accrued PTO, let alone the PTO she would have accrued through December 15, 2026.

158.    If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately. Cal. Lab Code § 201.

159.    Despite this clear obligation under California law, Acclaim failed to pay Mrs. Lin the full wages and benefits owed to her through the end of her employment term and has continued to withhold those amounts.

160.    The termination notice made no reference to performance issues and was issued in clear and obvious retaliation for Mr. Cox voicing his concerns with Acclaim's expenditures and the parties exercising their shareholder rights.

161.    Pursuant to the California Labor Code, Mrs. Lin's wages are due from June 1, 2026 through January 15, 2027 at a rate of $155,000 per year (totaling approximately $97,000), plus all unused and unpaid PTO (totaling approximately $12,500).

162.    As detailed above, Mrs. Lin is entitled to recover all unpaid wages owed from the date of discharge through December 15, 2026, together with a thirty (30) day penalty as provided by California Labor Code, pre-judgment interest at a rate of 10%, and with her reasonable costs and attorney's fees.

163.    Defendants' decision not to pay Mrs. Lin her salary and benefits was done knowingly, willfully, and in clear disregard of applicable law, justifying holding Mr. Turner personally liable for his participation and imposing all applicable penalties.

164.    Additionally, for the same reasons as detailed above, Mr. Turner should be held personally liable for all wages due and all interest and penalties thereon.

**WHEREFORE**, Plaintiff Mrs. Lin demands judgment in her favor and against Defendants Acclaim and Mr. Turner, for an amount exceeding $75,000, finding Defendants Acclaim and Mr. Turner are liable for violating California Labor Code against Plaintiff Mrs. Lin, plus an award of pre-and post judgement interest at a rate of 10%, attorney's fees, penalties, and any such other relief this Court deems equitable and just.

23

## COUNT III
### (California Labor Code § 1102.5 – Retaliation Against Plaintiff Cox)
### PLAINTIFF COX v. ALL DEFENDANTS

165. Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

166. An employer may not retaliate against an employee for disclosing information to a person with authority over the employee when the employee has reasonable cause to believe the information discloses a violation of state or federal law or regulation. Cal. Labor Code § 1102.5(b).

167. An employer also may not retaliate against an employee because the employer believes the employee has disclosed or may disclose such information. *Id*.

168. Mr. Cox engaged in protected activity under § 1102.5(b) when he raised concerns and asked questions internally about Acclaim's spending, finances, related-party transactions involving Liberty BPO, and the underlying issues of the previously initiated audit investigation.

169. These disclosures were directed at Mr. Turner who exercised authority over him as well as other executives at Acclaim.

170. In retaliation for this protected activity, Defendants drastically reduced Mr. Cox's role, responsibilities, and access to company systems, files, credit accounts, and other resources he previously oversaw.

171. The retaliation continued when Mr. Turner assigned Mr. Cox tasks he had not performed in years, terminated his employment without cause shortly before he could deliver completed deliverables, and revoked his access to the work email account containing those deliverables.

172. This adverse action was taken because Mr. Cox exercised his rights under § 1102.5(b).

173.    As a direct and proximate result of the retaliation, Mr. Cox has suffered economic harm, loss of employment, was forced to obtain a home equity line of credit to pay regular expenses, suffered embarrassment and other emotional distress, and was forced to retain counsel to protect his rights.

174.    Defendants are liable to Mr. Cox for all remedies available under California Labor Code § 1102.5, including a civil penalty of up to $10,000, back pay, front pay, emotional distress damages, and economic losses incurred as a result.

175.    Additionally, pursuant to § 1102.5(j), a "court is authorized to award reasonable attorney's fees to a plaintiff who brings a successful action for a violation of these provisions." Cal. Labor Code § 1102.5(j).

**WHEREFORE**, Plaintiff Mr. Cox demands judgment in his favor and against all Defendants for an amount exceeding $75,000, finding Defendants liable for violating California Labor Code § 1102.5(b) against Plaintiff Mr. Cox, including an award of pre-and post judgement interest, attorney's fees, and costs together with any such other relief this Court deems equitable and just.

## COUNT IV
### (California Labor Code § 1102.5 – Retaliation Against Plaintiff Lin)
### PLAINTIFF LIN v. ALL DEFENDANTS

176.    Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

177.    An employer is prohibited from retaliating against an employee because that employee is a family member of a person who has engaged in, or is perceived to have engaged in, protected activity under the statute. Cal. Labor Code § 1102.5(h).

178.    Mrs. Lin is Mr. Cox's wife.

25

179.    Mrs. Lin did not personally raise any concerns regarding the Company's finances or operations.

180.    Defendants nevertheless retaliated against Mrs. Lin solely because she is married to Mr. Cox, who had engaged in protected whistleblower activity under § 1102.5(b) by raising concerns about Acclaim's spending, finances, related-party transactions involving Liberty BPO, and the pending audit.

181.    Specifically, shortly after Mr. Cox began making these protected inquiries, Defendants drastically restricted Mrs. Lin's access to company systems and resources "out of an abundance of caution."

182.    Further, Defendants began winding down the California office where Mrs. Lin is employed in an obvious effort to create a path to terminate her employment.

183.    This adverse action constitutes prohibited family-member retaliation under § 1102.5(h).

184.    As a direct and proximate result of the retaliation, Mrs. Lin has suffered economic harm, loss of employment, was forced to obtain a home equity line of credit to pay regular expenses, suffered embarrassment and other emotional distress, and was forced to retain counsel to protect her rights.

185.    Defendants are liable to Mrs. Lin for all remedies available under California Labor Code § 1102.5, including a civil penalty of up to $10,000, back pay, front pay, emotional distress damages, and economic losses incurred as a result.

186.    Additionally, pursuant to § 1102.5(j), a "court is authorized to award reasonable attorney's fees to a plaintiff who brings a successful action for a violation of these provisions." Cal. Labor Code § 1102.5(j).

**WHEREFORE**, Plaintiff Mrs. Lin demands judgment in her favor and against all Defendants for an amount exceeding $75,000, finding Defendants liable for violating California Labor Code § 1102.5(h) against Plaintiff Mrs. Lin, including an award of pre-and post judgement interest, attorney's fees, and costs together with any such other relief this Court deems equitable and just.

**COUNT V**
**BREACH OF FIDUCIARY DUTY / SHAREHOLDER OPPRESSION**
**PLAINTIFFS INDIVIDUALLY v. DEFENDANT MR. TURNER**

187. Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

188. Acclaim is a Pennsylvania Corporation, thus Pennsylvania law applies to Mr. Turner's duties to its shareholders – including Mr. Cox and Mrs. Lin.

189. Pennsylvania has a broad definition of oppressive conduct which expressly includes "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Gee v. Blue Stone Heights Hunting Club, Inc.*, 604 A.2d 1141, 1145 (Pa. Cmwlth. 1992) (adopting rationale of New York state appellate courts); *see also* Ford v. Ford, 878 A.2d 894, 900 (Pa. Super. 2005) (adopting the "reasonable expectations" approach to determining oppressive conduct).

190. A shareholder's reasonable expectations "may include things such as their employment in the corporation, a role in management, or a share of the profits of the enterprise." *Lustig v. Seffer*, No. 110 EDA 2013, 2013 WL 11250861, at *4 (Pa. Super. Ct. Nov. 6, 2013) citing e.g., *Viener v. Jacobs*, 834 A.2d 546, 557 (Pa. Super. 2003).

191. Further, it is well settled in Pennsylvania that majority shareholders have a duty to protect the interests of the minority because they "occupy a quasi-fiduciary relation toward the

27

minority which prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." *Linde v. Linde*, 2019 PA Super 305, 220 A.3d 1119, 1142 (Pa. Super. 2019)(quoting *Hornsby v. Lohmeyer*, 364 Pa. 271, 72 A.2d 294, 298 (Pa. 1950).

192.    A "freeze out" or "squeeze out" is the "use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants … [and] normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose." *Id*.

193.    "[A]n attempt by a group of majority shareholders to 'freeze out' minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders." *Id*. (*quoting Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003) (a "freeze out" occurs in closely held corporation when minority shareholder is removed from office or his power or compensation is substantially diminished).

194.    Importantly, any attempt to "squeeze out a minority shareholder must be viewed as a breach of fiduciary duty." *Orchard v. Covelli*, 590 F.Supp. 1548, 1557 (W.D. Pa. 1984); see also *Ford v. Ford*, 2005 PA Super 237, 878 A.2d 894, 905 (Pa. Super. 2005) ("[f]reezing out the minority in order to benefit the majority is a breach of fiduciary duty").

195.    "Oppressive actions refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Ford*, 878 A.2d at 900.

196.    Damages in such an instance must necessarily consider the value before the oppression occurred. *See Viener v. Jacobs*, 834 A.2d 546, 558 (Pa. Super. 2003)("The trial court

concluded correctly that the proper method to calculate damages was to determine the actual value of Viener's stock prior to the date of his discharge because to choose a date after discharge would allow Jacobs to profit from his oppressive conduct towards Viener.")

197. As a director, officer, and majority shareholder of Acclaim, Mr. Turner owes fiduciary duties of care, loyalty, and good faith to the Company and to its minority shareholders, including Plaintiffs.

198. Mr. Turner has breached these fiduciary duties through a pattern of self-dealing and oppressive conduct, including diverting funds to Liberty BPO, his personal company, without proper invoices, documentation, or legitimate business purpose.

199. Mr. Turner has further breached his fiduciary duties by commingling corporate funds and expenses between Acclaim and himself and/or his personally controlled entities, and by making large personal withdrawals from Acclaim's accounts—including over $150,000.00 shortly after Mr. Cox began raising issues—while claiming the Company faced "cash flow challenges."

200. Moreover, after Mr. Cox raised legitimate concerns about Acclaim's finances, related-party transactions, and previously undisclosed audits, Mr. Turner retaliated by drastically reducing Mr. Cox's role and access, assigning him medial tasks, terminating his employment without cause, excluding him from board decisions and meetings, and restricting Mrs. Lin's access solely because she is Mr. Cox's wife.

201. Mr. Turner has additionally oppressed the Minority Shareholders' rights by filing inaccurate tax returns and SBA loan applications that falsely omitted the Minority Shareholders' ownership and misrepresented Mr. Turner as the 100% owner, by causing forged signatures to appear on official documents, and by refusing to provide requested corporate records despite repeated formal demands.

202.    Mr. Turner has also engaged in shareholder oppression by substantially defeating the Minority Shareholders reasonable expectations as shareholders in a closely held corporation.

203.    These reasonable expectations included continued employment with the Company, meaningful participation in management and governance, access to corporate information and records, and a fair share of the Company's profits and value.

204.    Further, the payments Mr. Turner has made to himself—directly and through his affiliated entities—constitute disproportionate distributions.

205.    Such conduct constitutes shareholder oppression under Pennsylvania law.

206.    As a direct and proximate result of Mr. Turner's breaches of fiduciary duty and oppressive conduct, the Minority Shareholders, have suffered significant harm, including loss of employment, diminished value of their ownership interest, denial of access to information, and other economic and non-economic damages.

**WHEREFORE,** Individual Plaintiffs demand judgment in their favor and against Defendant Turner, in an amount exceeding $75,000, plus costs, pre-judgment interest, post-judgment interest, and any such other relief this Court deems equitable and just.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
## PLAINTIFFS, ON BEHALF OF ACCLAIM v. DEFENDANT TURNER

207.    Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

208.    Plaintiffs bring this Count derivatively on behalf of Acclaim against Mr. Turner for breach of fiduciary duties that he owes the Company.

209.    As the majority shareholder, director, and controlling officer of Acclaim, Mr. Turner owes the Company fiduciary duties of care, loyalty, and good faith.

210. Mr. Turner has breached these fiduciary duties by engaging in self-dealing and misusing corporate assets for his personal benefit and the benefit of entities he solely controls as detailed more fully herein.

211. Specifically, Mr. Turner caused Acclaim to make substantial, and largely unsubstantiated payments to Liberty BPO.

212. Mr. Turner further breached his fiduciary duties by commingling Acclaim's funds and expenses with those of his other related entities, by paying Liberty BPO from Acclaim for work performed for his related entities and/or entities owned by his wife.

213. Mr. Turner also caused Acclaim to file inaccurate tax returns and SBA loan applications that misrepresented ownership of the Company, and permitted or directed the use of forged signatures on official documents.

214. These actions constitute self-dealing, waste of corporate assets, and improper diversion of corporate funds, all of which have harmed Acclaim and diminished the value of its assets.

215. As a direct and proximate result of Mr. Turner's breaches of fiduciary duty, Acclaim has suffered significant damages, including loss of corporate funds, depletion of cash reserves, damage to its financial condition and creditworthiness, and other harm to the Company.

216. Individual Plaintiffs, as shareholders of Acclaim, bring this derivative claim on behalf of the Company because Mr. Turner, as the controlling shareholder and director, controls the Company and would not cause it to sue himself.

217. Plaintiffs, acting derivatively on behalf of the Company were forced to expend their own personal resources, including but not limited to costs and attorneys' fees, to fund the litigation to obtain relief on behalf of the Company arising from Mr. Turner's unlawful conduct.

218.    Pennsylvania law also provides for the recoupment of Plaintiffs' reasonable expenses, including costs and attorneys' fees if a derivative action is successful in whole or in part. *See* 15 Pa. C.S. § 1784.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendant Turner, in an amount exceeding $75,000, plus costs, pre-judgment interest, post-judgment interest, and any such other relief this Court deems equitable and just.

**COUNT VII**
**EQUITABLE RELIEF – DECLARATORY JUDGMENT**
**<u>PLAINTIFFS v. DEFENDANTS</u>**

219.    Plaintiffs hereby incorporate by reference all prior paragraphs as though set forth fully at length herein.

220.    As detailed more fully above, an actual controversy exists between the parties regarding Plaintiffs' rights and interests as shareholders, and in Mr. Cox' case as director and former officer of Acclaim, the proper interpretation and current status of their Employment Agreements as modified by the parties' course of dealing, and the validity of certain corporate actions taken or proposed by Mr. Turner.

221.    Pursuant to Pennsylvania's BCL, in the case of a closely held corporation, a court may appoint a custodian upon application of a shareholder when "the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5% or more of the outstanding shares of any class of the corporation in their capacities as shareholders, directors, officers or employees." 15 Pa.C.S. § 1767(a)(2).

222.    As detailed above, Acclaim is a closely held corporation and Mr. Turner has oppressed the Minority Shareholders rights.

223.    Additionally, as detailed above, the Company's finances have suffered as a result Mr. Turner's unilateral conduct such that the Company may be on the verge of insolvency – while Mr. Turner continues to actively withdraw funds for his own personal benefit.

224.    Accordingly, the Minority Shareholders demand that this Court appoint a custodian to oversee the Company's finances, to obtain a valuation of the Company, to recover any improper payments made by the Company; to act in the best interest of the Company, and to continue the business of the Company in accordance with applicable law and regulations.

225.    Further, Plaintiffs, acting derivatively on behalf of the Company were forced to expend their own personal resources, including but not limited to costs and attorneys' fees, to fund the litigation to obtain relief on behalf of the Company arising from Mr. Turner's unlawful conduct.

226.    Pennsylvania law also provides for the recoupment of Plaintiffs' reasonable expenses, including costs and attorneys' fees if a derivative action is successful in whole or in part. *See* 15 Pa. C.S. § 1784.

**WHEREFORE,** Plaintiffs in their individual capacity and acting derivatively on behalf of Acclaim seek equitable relief as follows, together with such other relief this Court deems equitable and just:

a) Declare that Mr. Cox is a 10% shareholder of Acclaim with all attendant rights;

b) Declare that Mrs. Lin is a 10% shareholder of Acclaim with all attendant rights;

c) Declare that compensation terms of Mr. Cox's Employment Agreement were modified by the parties' course of dealing to provide Mr. Cox with an annual salary of $155,000 plus benefits;

d) Declare that compensation terms of Mrs. Lin's Employment Agreement were modified by the parties' course of dealing to provide Mrs. Lin with an annual salary of $155,000 plus benefits;

e) Appoint a custodian pursuant to 15 Pa.C.S. § 1767(a)(2) to:

    a.   Obtain an accounting of all payments made to Liberty BPO and/or any other entity and/or affiliate of Acclaim;

    b.   Determine all withdrawals or transfers by Mr. Turner from Acclaim, Liberty BPO, and/or its affiliates;

    c.   Obtain a neutral valuation of the Company to determine the fair market value of the Minority Shareholders' interests;

    d.   Oversee the Company's finances, act in the best interests of the Company and all of its shareholders—not just Mr. Turner; and

    e.   To continue the business of the Company in accordance with all applicable laws and regulations.

f)   Order that Mr. Turner buy out the Plaintiffs at the fair market value of their interests in Acclaim;

g)   Award Plaintiffs their costs and attorney's fees in obtaining relief individually and derivatively on behalf of Acclaim; and

h)   Such other equitable relief as the Court deems just and proper.


                Respectfully Submitted,

                **KAMINSKY LAW, LLC**

Dated:  August 12, 2026

                BY:_____
                Anton Kaminsky, Esquire
                PA I.D. No. 322660
                207 Buck Rd. Ste 2
                Southampton, PA 18966
                (215) 876-0800
                *Attorney for Plaintiffs*

**VERIFICATION**

I, Cynthia Lin, hereby verify that the statements made in the foregoing *Complaint* are true and correct to the best of my knowledge, information and belief.  I am aware that false statements of fact made knowingly are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

08/11/2026

_____
Date

*Cynthia Lin*
Cynthia Lin (Aug 11, 2026 15:21:08 PDT)
_____
Cynthia Lin

## <u>VERIFICATION</u>

I, Ryan Cox, hereby verify that the statements made in the foregoing *Complaint* are true and correct to the best of my knowledge, information and belief.  I am aware that false statements of fact made knowingly are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

08/11/2026

Date

*Ryan C Cox*

Ryan Cox

# EXHIBIT "A"

DocuSign Envelope ID: 2D5302E2-340A-4204-9089-459ABF828F23

AGMTS/AspireAutism/Part-time.Employment.Special Advisor.cln.041020

## PART-TIME EMPLOYMENT AGREEMENT

This AGREEMENT made as of the 20 day of April, 2020, between Aspire Autism Inc., ("Employer"), and Ryan Cox, an individual, ("Employee").

WHEREAS, Employer is a Pennsylvania corporation in need of certain administrative and consulting services; and,

WHEREAS, Employee is an individual experienced in and capable of providing such administrative and consulting services; and,

WHEREAS, Employee desires to provide such administrative and consulting services to and for the benefit of Employer as described herein; and,

WHEREAS, Employer desires to so engage Employee;

NOW THEREFORE, in consideration of the premises and of the undertakings and covenants set forth herein, and expressly intending to be legally bound hereby, the parties agree as follows:

1.      Employment.  Employer hereby employs Employee, who accepts such employment to provide certain administrative and consulting services ("Services") to and for the benefit of Employer pursuant to the terms of this Agreement.

2.      Term and Termination.

a.      The term of this Agreement shall be for an initial period of one (1) year (the "Initial Term") beginning May 1, 2020.  At the conclusion of the Initial Term, this Agreement shall automatically renew for successive twelve (12) month periods ("Successor Terms") until terminated as provided herein;  provided, however, that either party may, at any time, terminate this Agreement without cause, by providing not less than ninety (90) days advance written notice to the other party prior to the expiration of the Initial Term or any renewal term, in which event this Agreement will terminate at the expiration of that term.

b.      Either party may terminate this Agreement upon material breach by the other party, provided that the party alleging the breach shall provide to the allegedly breaching party written notice of such breach specifying the nature of the breach and a fifteen (15) day opportunity to cure.  Unless the breaching party has cured or substantially moved to cure the breach during such fifteen (15) day period, as determined in the reasonable discretion of the party alleging breach, this Agreement shall terminate immediately upon the conclusion of such fifteen (15) day period.

c.      Employer may terminate this Agreement immediately upon notice of the occurrence of any one of the following events:

 

(i)      conviction of either felony criminal acts by Employee or any crime relating to the performance of behavioral health services by any enforcement agency in any recognized jurisdiction of the United States or its territories;

(ii)      Employee becomes a "Sanctioned Person" within the meaning of §1128(b) of the Social Security Act or is otherwise suspended or excluded from Medicare, Medicaid or any government sponsored health care payment program;

(iii)      Employee is adjudicated incompetent or insane, or is addicted to drugs, or to have an addiction to alcohol which interferes with his ability to perform his duties hereunder;

(iv)      Employee becomes disabled for a period of more than forty-five (45) consecutive days.

d.      This Agreement shall terminate automatically upon the death of the Employee.

e.      Termination of this Agreement shall not terminate Employer's obligation to pay Employee all compensation due hereunder for Services performed by Employee during the term of this Agreement.

f.      If Employee is terminated for cause, or terminates this Agreement without cause prior to the conclusion of the Initial Term, Employee shall be required to reimburse Employer the cost of any certification fees plus Employer's administrative costs in assisting Employee in obtaining certification.

3.      <u>Compensation and Benefits</u>.

a.      For Employee's Services hereunder, Employee shall be entitled to receive as full compensation and reimbursement for all of Employee's Services and for the restrictive covenants contained herein, ten percent (10%) of profits at such times as Employer shall reasonably determine that Employer is profitable and at such times as Employer shall elect to make distributions of its profits to its shareholders, so long as the period of distribution commences no longer than six months from the time of profitability as determined by Employer, unless mutually agreed to in writing by both the Employer and Employee. Following the second anniversary of this Agreement, Employer shall confer upon Employee a 10% ownership interest in Employer, in accordance with Employer's shareholder agreement.  At no time shall Employee be considered an owner or shareholder in Employer, nor shall Employee be considered to have any controlling or voting interest in Employer prior to any ownership interest vesting as described herein.

 

b.      Employee shall be entitled to two (2) weeks paid time off annually, which may be expended for personal days, sick time, and vacation time. PTO days may not be carried over from one year to another.

4.      <u>Employee's Duties and Obligations</u>.

a.      Employee shall be employed on a part-time basis by Employer.  It is anticipated that Employee shall spend at least ten (10) hours per week providing Services to Employer or shall complete a set of deliverables that is agreed upon in advance reflecting 10 hours per week of work as mutually agreed upon between Employer and Emlpoyee.

b.      Assignments and scheduling of Employee shall be made in Employer's reasonable discretion after consultation with Employee, and Employee shall abide by such assignments.

c.      Employee agrees that, in rendering Services hereunder, Employee will comply with Employer's policies, standards and regulations, including those related to fraud and abuse compliance, which will be uniformly applied to all employees and will perform such Services in a manner and of a quality satisfactory to Employer, in its reasonable judgment, taking into account the Employee's ability to work effectively and harmoniously with other professional and non-professional staff of Employer.

d.      Employee's duties and obligations on behalf of the Employer hereunder shall further include, but not be limited to, the following:

(i)      assisting Employer with Employer's hiring process, including conducting interviews of candidates for professional and paraprofessional roles.

(ii)      negotiating and/or advising the Employer with the negotiation of payor agreements with third party insurance payors.

(iii)      developing standard operating procedures (SOPs) for matters including patient and staff scheduling, supervision timetables, patient admissions and discharges, ITP collaboration, service authorization processes, billing and claims submission, management controls, and human resource policies including paid travel time.

(iv)      passing all required clearances, including Pennsylvania's child abuse clearance, FBI fingerprinting, Pennsylvania criminal records check, Federal criminal records check, County criminal records checks, Sex Offender registry check, and Pennsylvania drivers license check.

(v)      providing consulting to Employer regarding initial monitoring of operational processes.

- 3 -

 

(vi)     develop copy for Employer's web site and blogs.

(vii)    provide copy editing for digital and physical content, to ensure relevance to Employer's industry.

(viii)   provide Employer with advice on business development and fundraising/capital raising efforts; social media management through official employer social media accounts as needed; and, market selection and expansion strategies.

(ix)    assist in managing market expansion efforts as needed.

5.    <u>Employee's Representations and Warranties</u>.  Employee hereby represents and warrants each of the following which shall be preconditions to any of Employer's obligations hereunder and each of which shall be a continuing obligation under this Agreement the breach of which shall be grounds for termination of this Agreement:

a.    Employee is not a "Sanctioned Person" under the meaning of Section 1128(b), of the Social Security Act, and has never been excluded from any federal health care program for any reason.

c.    Employee is not the subject of any known pending or threatened formal investigation by federal or state authorities which, if determined adversely with respect to Employee, would cause Employee to be a "sanctioned person."  Employee shall further use Employee's best efforts to ensure that any such investigation or determination does not have a material and adverse impact on Employer.

d.    Employee has not been, and is not currently, accused of a crime relating to Employee's professional activities or of any crime carrying a potential penalty of six (6) months or more of imprisonment.

6.    <u>Equipment, Space and Support</u>.  Employer may furnish Employee with equipment, facilities and ancillary support services, all of which in amounts Employer deems adequate and proper in its sole judgment and discretion.  Notwithstanding the foregoing, Employee shall use Employee's own computer, as well as a cellular phone.

7.    <u>Restrictive Covenant</u>.

a.    Employee agrees that during the Initial Term of this Agreement and any Successor Term and for two (2) years after its expiration or termination for any reason until another Agreement no longer restricts Employee, Employee shall not, without the express written consent of Employer, directly or indirectly, whether on Employee's own or in conjunction with any business, corporation, entity or person, undertake employment in an organization that provides similar behavioral health services within any state where Employer

- 4 -




provided services during the term of this Agreement.  This restrictive covenant shall not apply if Employer terminates Employee without cause, or Employee terminates this Agreement for cause.

b.      Employee agrees that during the Initial Term of this Agreement and any Successor Term and for two (2) years after its termination for any reason, Employee shall not, directly or indirectly, solicit any former or existing patient of the Employer, any employee of Employer employed by Employer at the time Employee's employment ends, or any contractual arrangement or referral source of Employer existing at the time of termination of Employee's employment.  This clause shall not prohibit Employee from participating in marketing and other activities for the benefit of Employer.  Employee further agrees that upon Employee's termination for any reason Employee shall make no public announcement of any kind regarding such termination without Employer's prior written approval.

c.      Employee agrees that the covenants contained in this paragraph 7 shall be construed as an agreement independent of any provision of this Agreement and the existence of any claim or cause of action on the part of Employee, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these Covenants.

d.      Employee specifically agrees that these covenants are reasonable in both scope and duration and will continue for the term of this Agreement, even after this Agreement is terminated until a new agreement no longer so restricts Employee, and because the remedies for a breach are inadequate and the result would irreparably harm Employer, that Employer may enforce it by obtaining an immediate injunction in a court of law or equity without the necessity of posting any bond in cash or otherwise.  Employee and Employer further agree that in the event that a court of competent jurisdiction deems this restrictive covenant in whole or in part to be unreasonable and unenforceable, the offending portions shall be modified by the Court in order to render these covenants valid and enforceable to the fullest extent permissible by law.

e.      The parties acknowledge that the terms of this section have been negotiated at arm's-length with advice of counsel and Employee understands the full extent and implication of the terms of this section, and hereby knowingly and voluntarily agrees to be bound hereby.

8.      <u>Notices</u>.  Written notices to be given hereunder shall be sent by nationally recognized courier to the address set forth below:

To Employer at:                              To Employee at:
Jamie Turner
Aspire Autism Inc.                        _____
2929 Arch St, Suite 1700               _____
Philadelphia PA 19104                _____

 

With a copy to:                                     With a copy to:

Daniel F. Shay, Esq.                                _____
Alice G. Gosfield and Associates, P.C.              _____
2309 Delancey Place                                 _____
Philadelphia, PA 19103                              _____

9.      <u>Confidentiality and Non-Disclosure</u>.  Employee recognizes and acknowledges that during the course of this Agreement, Employee will have access to certain information of Employer that is confidential and constitutes valuable, special and unique property of Employer. Employee agrees to keep confidential and not to disclose the professional and business practices, treatment methods, referral sources, patient lists, costs, prices, trade secrets, financial statements, financial information, training material or methods, supervision practices, or other privileged information ("Confidential Information") of Employer, directly or indirectly, or to use such Confidential Information in any way, either during the term of this Agreement or at any later date, nor shall Employee solicit or attempt to convert for his own use any source of business to Employer, or any employee of Employer, except as required in the course of fulfilling his responsibilities pursuant to this Agreement.

10.     <u>Waiver of Breach</u>.  No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise a right or remedy shall constitute a waiver.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, condition, agreement and term of Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

11.     <u>Entire Agreement</u>.  There are no other agreements or understandings, either oral or written, between the parties affecting this Agreement except as specifically provided for or referred to herein.  This Agreement cancels and supersedes all previous agreements between the parties relating to the subject matter covered by this Agreement.  No changes or addition nor deletion of any portion of this Agreement shall be valid or binding upon the parties hereto unless same is approved in writing by Employee and Employer, and signed by both.

12.     <u>Change of Law</u>.

a.      Notwithstanding any other provision of this Agreement, if during the term hereof any Change of Law (defined below) results in an Adverse Consequence (defined below), The parties agree to reasonable revisions to this Agreement to avoid such Adverse Consequence while seeking to maintain the parties as close as possible to their original positions despite such revisions.  Upon notice by one party to the other of such Change of Law, the parties agree that they shall attempt to resolve the matter within thirty (30) days of such notice.  If the parties cannot agree as to whether a Change of Law with an Adverse Consequence has occurred, the matter shall proceed to arbitration as set forth in Paragraph 13 herein.  If the parties cannot agree

- 6 -

  

upon renegotiated terms hereunder within thirty (30) days, then this Agreement will terminate immediately upon written notice by one party to the other of an inability to agree.

b.     As used herein, "Change of Law" shall mean: (i) any new legislation enacted by the federal or any state government; (ii) any new third party payor or governmental agency law, rule, regulation, guideline or interpretation of a previously issued law, rule, regulation or guideline; or, (iii) any judicial or administrative, order or decree.

c.     As used herein, "Adverse Consequence" shall mean a Change of Law that prohibits, restricts, limits or otherwise affects either party's rights or obligations hereunder in a material manner or otherwise makes it desirable to restructure the relationship established hereunder because of material legal consequences expected to result from such Change of Law.

13.     <u>Arbitration</u>.

a.     Any controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, except for matters set forth in Paragraphs 7 and 9 herein, shall be settled by arbitration, which shall be conducted in Pottsville, Pennsylvania in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

b.     Any party seeking resolution of such a dispute shall request arbitration not later than 6 months from the date it/he/she knew the dispute regarding the event giving rise to the arbitration request was unresolvable through informal means.  A failure to act hereunder shall constitute a waiver of any and all rights or claims relating to the dispute.

14.     <u>Parties Bound:  Assignment</u>.  This Agreement shall insure to the benefit of and shall be binding upon the respective successors and assigns of the parties hereto, but it may not be assigned in whole or in part by Employee or Employer without the prior written consent of the other party.

15.     <u>Invalid Provision</u>.  The invalidity or unenforceability of any or some particular provision or provisions of this Agreement shall not affect the other provisions hereof.  Should any one or more provisions hereof be adjudged to any extent invalid or unenforceable by any competent tribunal, such provision shall be deemed modified to the extent necessary to make this Agreement valid and enforceable.

16.     <u>Divisions And Headings</u>.  The division of this Agreement into paragraphs, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

- 7 -




17.     Governing Law.  This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

18.     Amendment.  No amendment, modification or waiver of any provision hereof shall be valid unless in writing signed by all the parties hereto.

19.     Survivability.  Paragraphs 7, 8, 9, 13, 15, 17, and this Paragraph 19 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Employer have executed this Agreement, effective as of the date first written above.

ASPIRE AUTISM, INC.                         EMPLOYEE

By: _____  4/20/2020     By: _____  4/21/2020
  B5A203E27760467...                          FFF8C87EC89545C...

Administrative Director

- 8 -

# EXHIBIT "B"

# 2023 Tax Return

# Excerpt

**SCHEDULE G**
**(Form 1120)**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock
▶ **Attach to Form 1120.**
▶ **See instructions on page 2.**

OMB No. 1545-0123

Name

ASPIRE AUTISM INC

Employer identification number (EIN)

███████████████

**Part I**  **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a). Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**  **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b). Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| JAMIE TURNER | ██████████ | US | 100 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120. **BAA**

REV 02/29/24 PRO

Schedule G (Form 1120) (Rev. 12-2011)

# 2024 Tax Return

# Excerpt

ASPI0618 08/11/2025 4:19 PM

| SCHEDULE G (Form 1120) | Information on Certain Persons Owning the Corporation's Voting Stock | |
|---|---|---|
| (Rev. December 2011) Department of the Treasury Internal Revenue Service | ▶ Attach to Form 1120. ▶ See instructions on page 2. | OMB No. 1545-0123 |

| Name | Employer identification number (EIN) |
|---|---|
| ASPIRE AUTISM INC | PERSONAL INFORMATION |

**Part I**    **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a). Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**    **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b). Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| JAMIE TURNER | PERSONAL INFORMATION | USA | 100.000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**      **Schedule G (Form 1120) (Rev. 12-2011)**

DAA

# EXHIBIT "C"

**KAMINSKY LAW**

**Anton Kaminsky, Esquire**
Licensed in PA & NJ
(215) 876 - 0800
Kaminsky.esq@gmail.com

November 6, 2025
**VIA EMAIL TO**: jturner@acclaimautism.com
**VIA PRIORITY MAIL TO**:
Aspire Autism Inc. d/b/a Acclaim Autism
Attn: Jamie Turner
2929 Arch Street, Suite 1700
Philadelphia, PA 19104

**Re:     DEMAND FOR CORPORATE RECORDS**

Mr. Turner,

My office has been retained as counsel for Ryan Cox ("Mr. Cox") and Cynthia Lin ("Mrs. Lin") (collectively the "Minority Shareholders") owning 10% and 5% of Aspire Autism Inc. d/b/a Acclaim Autism ("Acclaim" or the "Company") and collectively owning 15% of Acclaim.  I have been engaged to obtain a copy and/or facilitate the inspection of the corporate records of Acclaim and its operations dating back to its inception.  Enclosed is an authorization signed by the Minority Shareholders authorizing my office to act on their behalf.

It is my understanding that, the Shareholders' Agreement for Acclaim states that the Company will not furnish annual financial statements, but "any Shareholder shall have the right to request a financial statement from the corporation" and that any statement so requested shall be prepared by the "corporation, or its accountant, on the basis of generally accepted accounting principles." Accordingly, this correspondence should serve as a demand for the 2023, 2024, and 2025 financial reports.

Further, it is my understanding that in the last few months, Mr. Cox in his role as treasurer of Acclaim, began raising issues and asking questions about Acclaim's spending, finances, interested transactions, Liberty BPO, LLC ("Liberty BPO"), and the issues underlying the pending audit investigation.  Shortly thereafter, his role, reports, and access has been drastically limited. Specifically, Mr. Cox's access to file systems, credit accounts, and other systems that Mr. Cox previously oversaw were restricted. Similarly, Mrs. Lin's access has also been restricted "out of an abundance of caution." The same appears to be in direct response and retaliation for questioning Acclaim's finances, the pending audit, and Mr. Turner's expenditures.  It is our position that Mr. Cox is a member of the board of directors of Acclaim and a shareholder and, therefore, restricting such access in response to his inquiries and requests for information is improper, retaliatory, and should cease and desist immediately.

Separately, based on a review of the records available to Mr. Cox, it appears that there is minimal, if any, detail or clarity about Acclaim's expenses, loans, and/or large payments to Liberty BPO and other entities / accounts.  Further, it was recently discovered that the 2023 tax return does not identify Mr. Cox as a shareholder and misrepresents Mr. Turner as 100% owner of Acclaim. Upon information and belief, the same incorrect ownership mischaracterization was submitted in the most recent Live Oak SBA loan application.  It is my understanding that Mr. Cox has expressly sought details about Acclaim's operation and expenses, but was told that he had access to the

**Bucks County**
207 Buck Rd., Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 6, 2025
Page **2** of **3**

records, that the Company would not create records that did not exist in the ordinary course of business, and as a result, no records have been provided by the Company other than those that he could access himself.  Moreover, now his access to most of those records has been restricted.

Accordingly, please accept this correspondence as a formal demand by the Minority Shareholders to inspect and/or receive a copy of Acclaim's books and records of account, minutes of shareholder meetings, and consents in lieu of meetings from January 1, 2020 to the present date pursuant to 15 Pa.C.S. § 1508 of Pennsylvania's Business Corporation Law ("BCL").  Specifically, the Minority Shareholders seek the following:

1) The most recent version of the Company bylaws and other shareholder agreement(s)
2) Company meeting minutes and/or consents in lieu of meetings
3) Company agreements, including but not limited to:
    a. All Company agreements with any individual, entity, vendor, and/or service provider that received in excess of $50,000 from Acclaim in any calendar year since 2023, expressly including James Kennedy, Matthew McGrath, Qilin Xu, Jamie Turner and Liberty BPO
    b. All loan agreements between the Company and any lender and/or borrower
    c. All lease agreements that pertain to any rent paid by the Company
4) Records evidencing all loan terms and loan payments between 2020-2025 wherein the Company either borrowed or loaned money in excess of $10,000, even if such loan has been repaid.
5) Records evidencing all affiliates, subsidiaries, and/or related entities incorporated by and/or owned, either partially or wholly by Acclaim and the corporate structure / ownership of such entities.
6) Records evidencing all assets owned by the Company or its affiliates, subsidiaries, or related entities valued in excess of $50,000.
7) Books and Records of Account, including but not limited to:
    a. The Company's Tax Returns for 2020-2024
    b. All 1099s issued by the Company for 2020-2025
    c. All invoices received from and/or paid to Liberty BPO between 2020-2025
    d. All payments made in furtherance of any affiliate, subsidiary, and/or related entity between 2020-2025
    e. Detailed records evidencing the Company's accounts receivable sufficient to show the entity from which payments are due and the amount(s)
    f. Monthly credit card statements for all credit cards used and/or paid for by the Company between 2020-2025
    g. Detailed QuickBooks records for 2020-2025 evidencing payee(s) and categorization of all payments and/or categories of payments totaling more than $50,000 in any calendar year
    h. Monthly Company bank statements for 2020-2025
    i. Monthly Company credit card statements for 2020-2025
8) Any and all correspondence received relating to any audit of the Company and/or any affiliate, subsidiary, and/or related entity where in excess of $50,000 in payments is in dispute.

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 6, 2025
Page **3** of **3**

My client's purpose is to determine the propriety of certain payments, loans, and expenses and to understand the basis / defenses to the pending audit. Further, despite Acclaim not paying any distributions to the Minority Shareholders, it is reasonably believed that the majority shareholder and/or his related parties / entities receive compensation and/or other consideration in the form of payment for personal expenses and/or through unrelated entities from the Company. As a result, it is believed that the Minority Shareholders receive a disproportionate portion of the Company's true gross profit. Accordingly, the Minority Shareholders respectfully request a copy of the above detailed documents and communications, together with the records and communications on which the Company's Accountants rely to prepare annual tax returns.

As I am sure you are aware, 15 Pa.C.S. § 1508 of the BCL, provides a shareholder with the right to examine the books and records of a corporation upon five (5) business days' notice. Specifically, "[i]f the corporation, or an officer or agent thereof, refuses to permit an inspection sought by a shareholder or attorney or other agent acting for the shareholder … or does not reply to the demand within five business days after the demand has been received, the shareholder may file an action in the court for an order to compel the inspection." 15 Pa. C.S. § 1508(c).

Accordingly, please contact my office in the next five (5) business days to schedule a mutually agreeable time and method to inspect and copy such records. To the extent that such records are already digitally stored and/or electronically available, the Minority Shareholders respectfully request that they be re-produced in the same format. To avoid burdening the Company with unnecessary expense, I can provide a secure cloud drive or a USB drive to receive all such digitally stored data.

While my clients would prefer to avoid litigation and involving the courts to obtain such records, if I do not hear from you or your representative **by 5PM on November 13, 2025**, I will assume that you have no interest in providing the above requested information and will proceed with any available rights and remedies. To that end, this correspondence should serve as a notice of preservation in anticipation of litigation to preserve any and all documents and communications relating to or referencing Acclaim's operations, finances, payments, loans, and/or overall business dealings and negotiations between January 1, 2020 and the present date.

This is a serious matter, if you are represented by counsel, please forward this correspondence to their attention. Nothing in this correspondence is intended as a waiver of any arguments and the failure to identify specific issues is not a waiver of the same—all of which are expressly preserved.

Thank you for your prompt attention to this matter.

Sincerely,

**KAMINSKY LAW, LLC**

Anton Kaminsky, Esquire

# EXHIBIT "D"

# Articles of Incorporation

A set of formal documents filed with the Secretary of State to legally document the creation of a new business entity.







**Pennsylvania Department of State**
Bureau of Corporations and Charitable Organizations
PO Box 8722 | Harrisburg, PA 17105-8722
T: 717.787.1057
dos.pa.gov/BusinessCharities

April 11, 2023

REPUBLIC REGISTERED AGENT LLC
239 4TH AVE
STE 1401
PITTSBURGH, PA  15222-1715

| | |
|---|---|
| **Entity Name:** | SOCIAL SERVICES SQUAD INC. |
| **Entity File Date:** | March 20, 2023 |
| **Entity Number:** | 0013355516 |
| **Filing Type:** | Domestic Nonprofit Corporation |

The Bureau of Corporations and Charitable Organizations is happy to send your filed document. The Bureau is here to serve you and we would like to thank you for doing business in Pennsylvania.

Thank you for registering with the Department of State to do business in Pennsylvania. Like many other businesses, you may have employees, sell taxable products, or provide a taxable service to consumers in Pennsylvania. Please visit www.pa100.state.pa.us to register for business taxes with the Department of Revenue and the Department of Labor and Industry. You may also visit www.Business.pa.gov to find resources for businesses through all stages of development.

Nonprofit corporations that solicit funds from citizens of the Commonwealth of Pennsylvania for charatible purpose must register as a charitable organization with the Bureau of Corporations and Charitable Organizations of the Department of State, unless exempt from registration requirements. Please see www.dos.pa.gov/BusinessCharities/Charities for more information on registration or contact the Bureau of Corporations and Charitable Organizations at (717) 783-1720 or 1-800-732-0999 within

## PENNSYLVANIA DEPARTMENT OF STATE
## BUREAU OF CORPORATIONS AND CHARITABLE ORGANIZATIONS

☐ **Return document by mail to:**

LOVETTE DOBSON

Name:

17350 STATE HWY 249 #220

Address

| HOUSTON | TX | 77064 |
|---------|-----|-------|
| City | State | Zip Code |

☐ **Return document by email to:** _____

**Articles of Inc[orporation]**

DSCB:

(re[...])

**Pennsylvania Department of State**

**-FILED-**

File #: 0013355516

Date Filed: 3/20/2023

5306

Read all instructions prior to completing. This form may be submitted online at https://www.corporations.pa.gov/.

**Fee: $125**      ☐ I qualify for a veteran/reservist-owned small business fee exemption (see instructions)

Check one: ☑ Domestic Nonprofit Corporation (§ 5306)      ☐ Nonprofit Cooperative Corporation (§ 7102)

In compliance with the requirements of the applicable provisions (relating to articles of incorporation or cooperative corporations generally). the undersigned. desiring to incorporate a nonprofit/nonprofit cooperative corporation. hereby state(s) that:

---

1. The name of the corporation is:

   SOCIAL SERVICES SQUAD INC.

---

2. *Complete part (a) or (b) – not both:*

   (a) The address of this corporation's current registered office in this Commonwealth is:
   *(post office box alone is not acceptable)*

   | Number and Street | City | State | Zip | County |
   |-------------------|------|-------|-----|--------|

   (b) The name of this corporation's commercial registered office provider and the county of venue is:

   | c/o: REPUBLIC REGISTERED AGENT LLC | ALLEGHENY |
   |----|----|
   | Name of Commercial Registered Office Provider | County |

---

3. The corporation is incorporated under the Nonprofit Corporation Law of 1988 for the following purpose or purposes.
   HELP INDIVIDUALS WITH SPECIAL NEEDS AND UNIQUE ABILITIES TO ACCESS SOCIAL SERVICES.

---

4. The corporation does not contemplate pecuniary gain or profit, incidental or. otherwise.

---

5. *Check and complete one:* ☑ The corporation is organized on a nonstock basis.
   ☐ The corporation is organized on a stock share basis and the aggregate number of shares authorized is _____.

PA DEPT OF STATE

MAR 2 0 2023

B0514-4748 03/20/2023 2:00 PM Received by Pennsylvania Department of State

DSCB:15-5306/7102-2

B0514-4749 03/20/2023 2:00 PM Received by Pennsylvania Department of State

6. *For unincorporated association incorporating as a nonprofit corporation only. Check if applicable:*
____✓____ The incorporators constitute a majority of the members of the committee authorized to incorporate such association by the requisite vote required by the organic law of the association for the amendment of such organic law.

7. *For Nonprofit Corporation Only:*

*Check one:* ____✓____ The corporation shall have no members.
_____ The corporation shall have members.

8. *For Nonprofit Cooperative Corporation Only:*

*Check and complete one:*
_____ The corporation is a cooperative corporation and the common bond of membership among its members is: _____.
_____ The corporation is a cooperative corporation and the common bond of membership among its shareholders is: _____.

9. The name(s) and address(es) of each incorporator(s) is (are) *(all incorporators must sign below):*

| Name(s) | Address(es) |
|---|---|
| JAMIE TURNER | 408 E TURNBERRY CT , WEST CHESTER, PENNSYLVANIA 19382 |
| RYAN COX | 523 E LAKE VIEW RD , SYRACUSE, INDIANA 46567 |
| CYNTHIA LIN | 523 E LAKE VIEW RD , SYRACUSE, INDIANA 46567 |

10. The specified effective date, if any, is:

| month | day | year | hour, if any |
|---|---|---|---|

11. Additional provisions of the articles, if any, attach an 8½ x 11 sheet.

IN TESTIMONY WHEREOF, the incorporator(s) has/have signed these Articles of Incorporation this

__17TH__ day of __MARCH__ , __2023__ .

_Jamie Turner_
Signature

_Ryan Cox_
Signature

_Cynthia Lin_
Signature

# EXHIBIT "E"



**Anton Kaminsky, Esquire**
Licensed in PA & NJ
(215) 876 - 0800
Kaminsky.esq@gmail.com

November 28, 2025

**VIA EMAIL TO**: jturner@acclaimautism.com
**VIA PRIORITY MAIL TO**:
Aspire Autism Inc. d/b/a Acclaim Autism
Attn: Jamie Turner
2929 Arch Street, Suite 1700
Philadelphia, PA 19104

**Re:    ASPIRE AUTISM INC. – DEMAND ON CORPORATION**

Dear Mr. Turner,

As you are aware, my office is counsel for Ryan Cox ("Mr. Cox") and Cynthia Lin ("Mrs. Lin") (collectively the "Minority Shareholders") owning 10% and 5% of Aspire Autism Inc. d/b/a Acclaim Autism ("Acclaim" or the "Company") and collectively owning 15% of Acclaim. I write to the Corporation directly for notice purposes pursuant to the Business Corporation Law, 15 Pa.C.S. § 1101, *et seq*. and to make a formal demand on the Company.[1]

### Demand for Information about False Information on Business Records

Upon review of the documents available to the Minority Shareholders and/or produced by the Company, they discovered several concerning issues with Acclaim's business. At the outset, it appears that Acclaim's SBA and IRS filings don't accurately reflect the Minority Shareholders' ownership of the Company. Moreover, it appears that at least one set of filing documents contained signatures purporting to belong to Mr. Cox and Mrs. Lin, which were not actually the Minority Shareholders signatures. This correspondence should constitute a formal demand that the Company identify and correct any and all documents that were incorrectly or improperly filed with any governmental agency.

### Demand for Accounting and Recovery of Improperly Used Funds

The Minority Shareholders hereby make a formal demand that the Company perform an independent third-party accounting and demand that the Company begin proceedings to pursue the recovery of any funds determined to be made without proper corresponding invoice, improperly expended, and/or misappropriated.

Based on the documents provided with the November 17, 2025 document production it is evident that payments made to Liberty BPO, LLC ("Liberty BPO")—a company that is, upon information and belief, solely owned by Acclaim's CEO, Jaime Turner ("Mr. Turner")—are made without invoice and/or demonstrable basis as it is wholly unclear what "the Senior Manager

---

[1] Attorney John J. Cunningham, IV ("Attorney Cunningham") represented that he was engaged "to respond to [my] letter dated November 6, 2025" and, based on his letter dated November 17, 2025, it is unclear whether he was engaged to represent the Company going forward. Accordingly, he is copied for transparency and to avoid any semblance of impropriety.

**Bucks County**
207 Buck Rd., Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 28, 2025
Page **2** of **5**

requesting funds for specific things" means.  Further, the payments are sporadic and have drastically increased in frequency and amount. It is suspicious that there would not be any documentary basis underlying the payments especially where Liberty BPO is a related entity and does not have the same shareholder makeup as Acclaim.

Based on Mr. Cox's understanding, there are approximately twelve (12) to fourteen (14) employees of Liberty BPO, and their total monthly salaries should not total more than $20,000. However, for the past few months, the Company has been making substantially higher monthly payments to Liberty BPO, often approaching $30,000 and in some cases as high as $40,000. Accordingly, the Minority Shareholders seek to determine the basis, purpose, and propriety of these payments.  Upon information and belief, the excess payments are either for work done for entities other than Acclaim, i.e. for Happy Smiles at Columbia PLLC, a company owned by Qilin Xu, Mr. Turner's wife, or a method for Mr. Turner to take distributions from Acclaim without making commensurate payments to the Minority Shareholders.  To the extent that any payments were made to Liberty BPO that were improper or for any purpose other than in furtherance of Acclaim's business, the Minority Shareholders demand that the Company recover those payments.

Similarly, based on the available records, it is the Minority Shareholders belief that various costs are not parsed by the company to which they apply and are, instead, all paid by Acclaim. Accordingly, the Minority Shareholders also seek that all software costs, hardware costs, and other incidentals that are in furtherance of or attributed to anything other than Acclaim's business be accounted for and returned.  To the extent that those individuals or entities refuse to voluntarily return the funds, this correspondence should serve as a formal demand upon the Company to initiate legal action to recover the same.

Further, while taking the position that the business is experiencing "cash flow challenges" since receiving the Minority Shareholders' November 5, 2025 correspondence, it appears that Mr. Turner, withdrew in excess of $150,000 from the Company's accounts, including a repayment of a $40,000 "loan" to himself and a transfer to an unknown checking account for $51,000.  In fact, it appears that since the correspondence seeking records, the Company's cash went from approximately $343,000 to approximately $33,000 as of the date of this correspondence.  To that end, it appears that the "cash flow challenges" are self-inflicted and resulting solely from Mr. Turner's conduct.  The Minority Shareholders believe that the above conduct may constitute a breach of Mr. Turner's fiduciary duty to the Company and its Shareholders.

Finally, it is the Minority Shareholders' belief and understanding that James Kennedy, Acclaim's accountant has or had a financial interest in Acclaim and/or has loaned Acclaim funds in the past and permitted the above financial improprieties to persist. It is the Minority Shareholders' position that, in addition to a potential breach of fiduciary duty, any financial improprieties have a material and adverse impact on the Company's continued viability and the value of the Minority Shareholders' interests. Accordingly, the Minority Shareholders seek an ***independent third-party accounting*** of the Company's income and expenditures as the current accountant has an unwaivable conflict.

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 28, 2025
Page **3** of **5**

While that is being done, the Minority Shareholders, and specifically Mr. Cox as treasurer, seek that Mr. Turner act in his role as a fiduciary of Acclaim, ensure the Company's continued viability, and cease and desist from:

- Entering into any loans, financial arrangements, or other types of agreements binding Acclaim without providing the details of such loans / arrangements / agreements to the board of directors of Acclaim;
- Making loan repayments to himself or any of his relatives / related entities;
- Making payments to Liberty BPO without an invoice detailing the services / goods for which payment is being made;
- Making payments towards any company and/or in furtherance of any company's expenses in which he or his wife have interest without providing the details of such payments to the board of directors of Acclaim;
- Making payments outside the regular course of business in excess of $5,000 without providing the details of such payments to the board of directors of Acclaim.

## Demand to Maintain Status Quo

Separately, it appears that Mr. Turner has been removing / revoking Mr. Cox and Mrs. Lin's access, duties, and responsibilities within the Company.  As to Mr. Cox, Mr. Turner has repeatedly attempted to shift him to Xelen and demanded that he raise funds for Xelen. However, for the reasons set forth above, including the lack of transparency into Acclaim's finances and dealings, it is highly unlikely that Xelen will be able to raise funds while Acclaim remains an investor / owner.  Moreover, the shift, revocation of Acclaim access and duties, and attempt to pigeonhole Mr. Cox into Xelen appears to be in direct retaliation for Mr. Cox raising issues about Acclaim's dealings. Similarly, with respect to Mrs. Lin, although she has not personally raised any issues, Mr. Turner has similarly began revoking her access, duties, and responsibilities.  This conduct appears to be solely in retaliation for Mr. Cox raising the above issues.

It is the Minority Shareholders' position that Mr. Turner is attempting to create a narrative to terminate them, without any grounds or justification therefor.  While he appears to be positioning their conduct as insubordination or necessitated by the company's financial position, the Minority Shareholders maintain that it is solely in response to Mr. Cox's attempts to ensure the Company is financially sound, get to the bottom of the provider audits, and inquiries about potentially improper expenses and expenditures.  Moreover, just a few months ago—before Mr. Cox raised any issues—Mr. Turner was praising his performance and promising him and Mrs. Lin a raise.

To this end, the Minority Shareholders demand that the Company and Mr. Turner maintain *status quo* while the accounting and demand on the Company are resolved.  It is the Minority Shareholders' position that failure to do so may constitute shareholder oppression, frustrate their reasonable expectations as minority shareholders in a closely held corporation, and justify immediate legal action.  At this juncture, they would prefer to avoid any such actions.

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 28, 2025
Page **4** of **5**

Further, at all times material hereto, Mr. Cox was a member of Acclaim's board of directors. However, recently Mr. Turner began removing board meeting calendar invites from Mr. Cox's calendar and started taking corporate actions, engaging counsel, and making major business decisions without consulting the board—or Mr. Cox. Instead, it appears that such actions are purposefully being done in a clandestine way while excluding Mr. Cox and preventing him from getting information, making his position heard, and/or corresponding with individuals who have access to relevant information. Upon information and belief, Mr. Turner has embarked on a campaign of false and defamatory statements about Mr. Cox (and potentially Mrs. Lin) to convince employees to ignore his position, inquiries, and directives. This is a formal demand that such conduct cease and desist immediately and that Mr. Cox be included as a board member and on decisions that require (or should require) board approval.

## Shareholder Meeting

The Minority Shareholders have also been made aware of a shareholder meeting for the purpose of, among other things, "[t]o update and revise the existing Shareholder Agreement." To that end, the Minority Shareholders seek a draft new Shareholder Agreement and/or the proposed revisions in advance of the December 10, 2025 shareholder meeting so that they may have time to review and provide comment as any such new agreement would presumably require their signature and approval. Similarly, they seek a share register identifying all shareholders of the Company and their respective ownership.

Similarly, Mr. Turner represented that new directors would be elected at the meeting. To that end, in advance of the shareholder meeting, the Minority Shareholders seek information about the length of Mr. Cox's term, whether it is Mr. Turner's position that Mr. Cox is up for re-election at the meeting, information about any other individuals seeking a position on the board together with information that justifies adding them to Acclaim's board. Such information is relevant and necessary for the Minority Shareholders to review in advance of the meeting so they can competently participate in any voting thereon.

Please confirm the Corporation's position with respect to the above, in writing as soon as possible, in advance of the December 10, 2025 shareholder meeting. Please also accept this correspondence as notice that the Minority Shareholders intend to raise these matters at the Shareholder Meeting.

This is a serious matter, if you or the Corporation are represented by counsel, please forward this to their attention. Additionally, it is the Minority Shareholders' position that it is wholly improper for Liberty BPO, Mr. Turner and Mrs. Xu to be represented by the same counsel as the Company as, to the extent there were any improper payments made to them or their entities, there would be an inherent conflict of interest in counsel's representation.

Nothing in this correspondence is intended as a waiver of any arguments and the failure to identify specific issues is not a waiver of the same—all of which are expressly preserved.

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
November 28, 2025
Page **5** of **5**

Thank you for your prompt attention to this matter.

Sincerely,

**KAMINSKY LAW, LLC**

Anton Kaminsky, Esquire

**CC VIA EMAIL TO**: jcunningham@lambmcerlane.com
John J. Cunningham, IV

# EXHIBIT "F"

Aspire Autism, Inc. d/b/a Acclaim Autism

January 23, 2026

**By Federal Express Overnight Delivery**

Ryan Cox
117 Sora
Irvine, CA 92618

Re: Notice of Termination of Employment Effective April 30, 2026

Dear Ryan:

This letter serves as formal notice that Aspire Autism Inc. d/b/a Acclaim Autism ("Company") is terminating your employment pursuant to Section 2(a) of the Part-Time Employment Agreement by and between the Company and you, dated April 20, 2020 (the "Agreement").

In accordance with Section 2(a) of the Agreement, termination shall be effective at the end of the current term, April 30, 2026 (the "Termination Date"). As of the Termination Date, your employment with the Company shall cease in all respects. This termination applies to all roles and capacities in which you serve or may serve with the Company, including, without limitation, as an employee, to the extent applicable.

Effective immediately upon receipt of this notice, you shall no longer have access to the Company's office premises, systems, or property. You are directed to promptly return all Company property, including but not limited to keys, access devices, documents, records, equipment, and any other assets belonging to the Company, in your possession, custody, or control. A prepaid return envelops is included with this notice for the Macbook Pro computer and other items.

You shall comply with all of your responsibilities and obligations to the Company (including, but not limited to, non-solicitation and confidentiality pursuant to Sections 7(b) and 9 of the Agreement). Any remaining rights and obligations of the parties shall be governed by the terms of the Agreement and applicable law.

Please direct any questions regarding logistics related to the return of Company property to Jamie Turner, President.

Sincerely,

Jamie Turner, President
Aspire Autism Inc. d/b/a Acclaim Autism

# EXHIBIT "G"

AGMTS/AspireAutism/Part-time.Employment.Special Advisor.cln.041020

## PART-TIME EMPLOYMENT AGREEMENT

This AGREEMENT made as of the 15 day of December, 2021, between Aspire Autism Inc., ("Employer"), and Cynthia Lin, an individual, ("Employee").

WHEREAS, Employer is a Pennsylvania corporation in need of certain administrative and operational services; and,

WHEREAS, Employee is an individual experienced in and capable of providing such administrative and operational services; and,

WHEREAS, Employee desires to provide such administrative and operational services to and for the benefit of Employer as described herein; and,

WHEREAS, Employer desires to so engage Employee;

NOW THEREFORE, in consideration of the premises and of the undertakings and covenants set forth herein, and expressly intending to be legally bound hereby, the parties agree as follows:

1.      Employment.  Employer hereby employs Employee, who accepts such employment to provide certain administrative and consulting services ("Services") to and for the benefit of Employer pursuant to the terms of this Agreement.

2.      Term and Termination.

a.      The term of this Agreement shall be for an initial period of one (1) year (the "Initial Term") beginning December 15, 2021.  At the conclusion of the Initial Term, this Agreement shall automatically renew for successive twelve (12) month periods ("Successor Terms") until terminated as provided herein;  provided, however, that either party may, at any time, terminate this Agreement without cause, by providing not less than ninety (90) days advance written notice to the other party prior to the expiration of the Initial Term or any renewal term, in which event this Agreement will terminate at the expiration of that term.

b.      Either party may terminate this Agreement upon material breach by the other party, provided that the party alleging the breach shall provide to the allegedly breaching party written notice of such breach specifying the nature of the breach and a fifteen (15) day opportunity to cure.  Unless the breaching party has cured or substantially moved to cure the breach during such fifteen (15) day period, as determined in the reasonable discretion of the party alleging breach, this Agreement shall terminate immediately upon the conclusion of such fifteen (15) day period.

c.      Employer may terminate this Agreement immediately upon notice of the occurrence of any one of the following events:

(i)     conviction of either felony criminal acts by Employee or any crime relating to the performance of behavioral health services by any enforcement agency in any recognized jurisdiction of the United States or its territories;

(ii)     Employee becomes a "Sanctioned Person" within the meaning of §1128(b) of the Social Security Act or is otherwise suspended or excluded from Medicare, Medicaid or any government sponsored health care payment program;

(iii)     Employee is adjudicated incompetent or insane, or is addicted to drugs, or to have an addiction to alcohol which interferes with his ability to perform his duties hereunder;

(iv)     Employee becomes disabled for a period of more than forty-five (45) consecutive days.

d.     This Agreement shall terminate automatically upon the death of the Employee.

e.     Termination of this Agreement shall not terminate Employer's obligation to pay Employee all compensation due hereunder for Services performed by Employee during the term of this Agreement.

f.     If Employee is terminated for cause, or terminates this Agreement without cause prior to the conclusion of the Initial Term, Employee shall be required to reimburse Employer the cost of any certification fees plus Employer's administrative costs in assisting Employee in obtaining certification.

3.     <u>Compensation and Benefits</u>.

a.     For Employee's Services hereunder, Employee shall be entitled to receive as full compensation and reimbursement for all of Employee's Services and for the restrictive covenants contained herein, $30 per hour for time worked until May 31, 2022. Effective June 1, 2022, compensation five percent (5%) of profits at such times as Employer shall reasonably determine that Employer is profitable and at such times as Employer shall elect to make distributions of its profits to its shareholders.  On June 1st, 2024, a 5% ownership interest in Employer, in accordance with Employer's shareholder agreement shall be given by Employer to Employee.  At no time shall Employee be considered an owner or shareholder in Employer, nor shall Employee be considered to have any controlling or voting interest in Employer prior to any ownership interest vesting as described herein.

b.     Employee shall be entitled to two (2) weeks paid time off annually, which may be expended for personal days, sick time, and vacation time. PTO days may not be carried over from one year to another.

- 2 -

4.    <u>Employee's Duties and Obligations</u>.

a.    Employee shall be employed on a part-time basis by Employer.  It is anticipated that Employee shall spend at least ten (10) hours per week providing Services to Employer.

b.    Assignments and scheduling of Employee shall be made in Employer's reasonable discretion after consultation with Employee, and Employee shall abide by such assignments.

c.    Employee agrees that, in rendering Services hereunder, Employee will comply with Employer's policies, standards and regulations, including those related to fraud and abuse compliance, which will be uniformly applied to all employees and will perform such Services in a manner and of a quality satisfactory to Employer, in its reasonable judgment, taking into account the Employee's ability to work effectively and harmoniously with other professional and non-professional staff of Employer.

d.    Employee's duties and obligations on behalf of the Employer hereunder shall further include, but not be limited to, the following:

(i)    assisting Employer with Employer's hiring process, including conducting interviews of candidates for professional and paraprofessional roles.

(ii)    negotiating payor agreements with third party insurance payors.

(iii)    developing standard operating procedures (SOPs) for matters including patient and staff scheduling, supervision timetables, patient admissions and discharges, ITP collaboration, service authorization processes, billing and claims submission, management controls, and human resource policies including paid travel time.

(iv)    passing all required clearances, including Pennsylvania's child abuse clearance, FBI fingerprinting, Pennsylvania criminal records check, Federal criminal records check, County criminal records checks, Sex Offender registry check, and Pennsylvania drivers license check.

(v)    providing consulting to Employer regarding initial monitoring of operational processes.

(vi)    develop copy for Employer's web site and blogs.

- 3 -

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

(vii)    provide copy editing for digital and physical content, to ensure relevance to Employer's industry.

(viii)    provide Employer with advice on business development and fundraising/capital raising efforts; social media management as needed; and, market selection and expansion strategies.

(ix)    assist in managing market expansion efforts as needed.

5.    Employee's Representations and Warranties.  Employee hereby represents and warrants each of the following which shall be preconditions to any of Employer's obligations hereunder and each of which shall be a continuing obligation under this Agreement the breach of which shall be grounds for termination of this Agreement:

a.    Employee is not a "Sanctioned Person" under the meaning of Section 1128(b), of the Social Security Act, and has never been excluded from any federal health care program for any reason.

c.    Employee is not the subject of any known pending or threatened formal investigation by federal or state authorities which, if determined adversely with respect to Employee, would cause Employee to be a "sanctioned person."  Employee shall further use Employee's best efforts to ensure that any such investigation or determination does not have a material and adverse impact on Employer.

d.    Employee has not been, and is not currently, accused of a crime relating to Employee's professional activities or of any crime carrying a potential penalty of six (6) months or more of imprisonment.

6.    Equipment, Space and Support.  Employer may furnish Employee with equipment, facilities and ancillary support services, all of which in amounts Employer deems adequate and proper in its sole judgment and discretion.  Notwithstanding the foregoing, Employee shall use Employee's own computer, as well as a cellular phone.

7.    Restrictive Covenant.

- 4 -

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

a.      Employee agrees that during the Initial Term of this Agreement and any Successor Term and for two (2) years after its expiration or termination for any reason until another Agreement no longer restricts Employee, Employee shall not, without the express written consent of Employer, directly or indirectly, whether on Employee's own or in conjunction with any business, corporation, entity or person, undertake employment in an organization that provides similar behavioral health services within any state where Employer provided services during the term of this Agreement.  This restrictive covenant shall not apply if Employer terminates Employee without cause, or Employee terminates this Agreement for cause.

b.      Employee agrees that during the Initial Term of this Agreement and any Successor Term and for two (2) years after its termination for any reason, Employee shall not, directly or indirectly, solicit any former or existing patient of the Employer, any employee of Employer employed by Employer at the time Employee's employment ends, or any contractual arrangement or referral source of Employer existing at the time of termination of Employee's employment.  This clause shall not prohibit Employee from participating in marketing and other activities for the benefit of Employer.  Employee further agrees that upon Employee's termination for any reason Employee shall make no public announcement of any kind regarding such termination without Employer's prior written approval.

c.      Employee agrees that the covenants contained in this Paragraph 8 shall be construed as an agreement independent of any provision of this Agreement and the existence of any claim or cause of action on the part of Employee, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these Covenants.

d.      Employee specifically agrees that these covenants are reasonable in both scope and duration and will continue for the term of this Agreement, even after this Agreement is terminated until a new agreement no longer so restricts Employee, and because the remedies for a breach are inadequate and the result would irreparably harm Employer, that Employer may enforce it by obtaining an immediate injunction in a court of law or equity without the necessity of posting any bond in cash or otherwise.  Employee and Employer further agree that in the event that a court of competent jurisdiction deems this restrictive covenant in whole or in part to be unreasonable and unenforceable, the offending portions shall be modified by the Court in order to render these covenants valid and enforceable to the fullest extent permissible by law.

e.      The parties acknowledge that the terms of this section have been negotiated at arms-length with advice of counsel and Employee understands the full extent and implication of the terms of this section, and hereby knowingly and voluntarily agrees to be bound hereby.

8.      Notices.  Written notices to be given hereunder shall be sent by nationally recognized overnight courier, to the address set forth below:

- 5 -

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

To Employer at:                              To Employee at:

Jamie Turner                                 Cynthia Lin
Aspire Autism Inc.                           523 E Lake View Rd
2929 Arch St, Suite 1700                     Syracuse, IN 46567
Philadelphia PA 19104


With a copy to:                              With a copy to:


Daniel F. Shay, Esq.                         N/A
Alice G. Gosfield and Associates, P.C.
2309 Delancey Place
Philadelphia, PA 19103


9.      <u>Confidentiality and Non-Disclosure</u>.  Employee recognizes and acknowledges that during the course of this Agreement, Employee will have access to certain information of Employer that is confidential and constitutes valuable, special and unique property of Employer. Employee agrees to keep confidential and not to disclose the professional and business practices, treatment methods, referral sources, patient lists, costs, prices, trade secrets, financial statements, financial information, training material or methods, supervision practices, or other privileged information ("Confidential Information") of Employer, directly or indirectly, or to use such Confidential Information in any way, either during the term of this Agreement or at any later date, nor shall Employee solicit or attempt to convert for his own use any source of business to Employer, or any employee of Employer, except as required in the course of fulfilling his responsibilities pursuant to this Agreement.

10.      <u>Waiver of Breach</u>.  No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement or to exercise a right or remedy shall constitute a waiver.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, condition, agreement and term of Agreement shall continue in full force and effect with respect to any other existing or subsequent breach.

11.      <u>Entire Agreement</u>.  There are no other agreements or understandings, either oral or written, between the parties affecting this Agreement except as specifically provided for or referred to herein.  This Agreement cancels and supersedes all previous agreements between the parties relating to the subject matter covered by this Agreement.  No changes or addition nor deletion of any portion of this Agreement shall be valid or binding upon the parties hereto unless same is approved in writing by Employee and Employer, and signed by both.

12.      <u>Change of Law</u>.

a.      Notwithstanding any other provision of this Agreement, if during the term hereof any Change of Law (defined below) results in an Adverse Consequence (defined below),

- 6 -

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

The parties agree to reasonable revisions to this Agreement to avoid such Adverse Consequence while seeking to maintain the parties as close as possible to their original positions despite such revisions.  Upon notice by one party to the other of such Change of Law, the parties agree that they shall attempt to resolve the matter within thirty (30) days of such notice.  If the parties cannot agree as to whether a Change of Law with an Adverse Consequence has occurred, the matter shall proceed to arbitration as set forth in Paragraph 13 herein.  If the parties cannot agree upon renegotiated terms hereunder within thirty (30) days, then this Agreement will terminate immediately upon written notice by one party to the other of an inability to agree.

       b.     As used herein, "Change of Law" shall mean: (i) any new legislation enacted by the federal or any state government; (ii) any new third party payor or governmental agency law, rule, regulation, guideline or interpretation of a previously issued law, rule, regulation or guideline; or, (iii) any judicial or administrative, order or decree.

       c.     As used herein, "Adverse Consequence" shall mean a Change of Law that prohibits, restricts, limits or otherwise affects either party's rights or obligations hereunder in a material manner or otherwise makes it desirable to restructure the relationship established hereunder because of material legal consequences expected to result from such Change of Law.

    13.    <u>Arbitration</u>.

       a.     Any controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, except for matters set forth in Paragraphs 7 and 9 herein, shall be settled by arbitration, which shall be conducted in Pottsville, Pennsylvania in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

       b.     Any party seeking resolution of such a dispute shall request arbitration not later than 6 months from the date it/he/she knew the dispute regarding the event giving rise to the arbitration request was unresolvable through informal means.  A failure to act hereunder shall constitute a waiver of any and all rights or claims relating to the dispute.

    14.    <u>Parties Bound:  Assignment</u>.  This Agreement shall inure to the benefit of and shall be binding upon the respective successors and assigns of the parties hereto, but it may not be assigned in whole or in part by Employee or Employer without the prior written consent of the other party.

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

15.    <u>Invalid Provision</u>.  The invalidity or unenforceability of any or some particular provision or provisions of this Agreement shall not affect the other provisions hereof.  Should any one or more provisions hereof be adjudged to any extent invalid or unenforceable by any competent tribunal, such provision shall be deemed modified to the extent necessary to make this Agreement valid and enforceable.

16.    <u>Divisions And Headings</u>.  The division of this Agreement into paragraphs, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

17.    <u>Governing Law</u>.  This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

18.    <u>Amendment</u>.  No amendment, modification or waiver of any provision hereof shall be valid unless in writing signed by all the parties hereto.

19.    <u>Survivability.</u>  Paragraphs 7, 8, 9, 13, 15, 17, and this Paragraph 19 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Employer have executed this Agreement, effective as of the date first written above.

ASPIRE AUTISM, INC.                EMPLOYEE

By: *Jamie Turner* 12 / 17 / 2021      By: *Cynthia Lin* 12 / 16 / 2021
     Jamie Turner                    Cynthia Lin

- 8 -

Doc ID: 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Document for review |
| **FILE NAME** | Part Time Ops Man...thia.docx (1).pdf |
| **DOCUMENT ID** | 4d9ad8a2e02d2d8b7f26bdc37fecee0bf57e7f0f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **12 / 16 / 2021** 10:58:58 UTC-5 | Sent for signature to Cynthia Lin (himynameiscyn@gmail.com) and Jamie Turner (jturner@aspireautism.com) from jturner@aspireautism.com IP: 72.20.212.2 |
| **VIEWED** | **12 / 16 / 2021** 16:08:31 UTC-5 | Viewed by Cynthia Lin (himynameiscyn@gmail.com) IP: 12.86.123.90 |
| **SIGNED** | **12 / 16 / 2021** 16:27:34 UTC-5 | Signed by Cynthia Lin (himynameiscyn@gmail.com) IP: 12.86.123.90 |
| **VIEWED** | **12 / 17 / 2021** 12:04:52 UTC-5 | Viewed by Jamie Turner (jturner@aspireautism.com) IP: 100.14.82.44 |
| **SIGNED** | **12 / 17 / 2021** 12:05:24 UTC-5 | Signed by Jamie Turner (jturner@aspireautism.com) IP: 100.14.82.44 |
| **COMPLETED** | **12 / 17 / 2021** 12:05:24 UTC-5 | The document has been completed. |

Powered by **HELLOSIGN**

# EXHIBIT "H"

# CA Operations Memo

**Jamie Turner** <jturner@acclaimautism.com>                                        Mon, Mar 23, 2026 at 10:30 AM
To: Cynthia Lin <clin@acclaimautism.com>
Cc: hr@acclaimautism.com

Hi Cyn,

This memo is intended to document performance and structural considerations for CA operations and outline the adjustments required moving forward.

### Original Operating Model

As part of the initial budget and operating plan developed in December 2022 and finalized in May 2023, CA operations were structured to prioritize social skills group services as the primary service line. 1:1 ABA services were only intended to supplement this model for clients already participating in group programming.

This structure was developed based on California reimbursement rates, which indicated that a 1:1 ABA model would not be financially viable as a primary service offering.

### Current Operating Model

CA operations were however implemented with a 1:1 ABA service model. While this approach can support individual client needs, it differs from the agreed operating structure and the financial assumptions underlying it.

As reflected in financial reporting, CA operations have continued to operate at a significant loss, including losses exceeding $200,000 in 2025.

### Execution of Agreed Initiatives

In addition to the service model shift, several agreed initiatives intended to support growth and diversification have not been implemented, including:

- Expansion into additional billing codes (including LCSW services), which was discussed as early as March 2024 and again in April 2025
- Development of a broader service offering to support a more comprehensive care model

These initiatives were intended to test demand and support future decisions regarding potential investment in center-based services.

### Performance Against Benchmarks

As previously documented, multiple performance benchmarks have been established for CA operations, including targets of 150 and 300 weekly billable hours.

Actual performance has remained below these targets, generally ranging between approximately 70–110 weekly hours.

### Operational Alignment

CA operations have also diverged from Acclaim's standard operating model in terms of administrative workflow. Functions typically supported by centralized administrative teams have been handled locally rather than through established back-office processes.

### Operational Support and Transition

To improve alignment and provide additional operational support, intake and scheduling responsibilities for CA operations will transition to Taysia Harvey.

I will schedule time early this week to begin this transition.

Effective immediately:

- Taysia should be included in all communications related to CA staff, families, intake, scheduling, and coordination using the shared inbox (cathy@acclaimautism.com) should be included in all CA-related communications with staff, families, and the back-office administrative team
- Please do not email any Acclaim Autism staff or famlies except through the above shared inbox, which you also have access to

Use of the shared inbox was part of the intended operating structure when CA operations were established and is necessary to ensure visibility, continuity, and coordination across teams.

I will communicate these updates to the CA team directly to ensure clarity and consistency as we implement this transition.

**Conclusion and Next Steps**

Based on the above, the current structure and operating approach for CA have not demonstrated a sustainable path to financial viability.

Accordingly, the company will be implementing structural adjustments to better align CA operations with Acclaim's operating model and financial requirements.

We will continue to evaluate CA operations based on measurable progress under this aligned structure.

Please let me know if you have any questions.

Thanks,
Jamie


On Thu, Mar 5, 2026 at 11:56 AM Cynthia Lin <clin@acclaimautism.com> wrote:
TO: Jamie Turner, President
FROM: Cynthia Lin
DATE: March 5, 2026
RE: Response to CA Operations Memo — Submitted Under Protest

**Preliminary Statement**

I am submitting this response and the operational plan below in good faith and under protest. I do not accept the premise that the performance gaps cited in the February 27 memo reflect a failure of leadership or effort. The benchmarks referenced were established without a corresponding commitment of the resources, staffing, or structural support required to meet them. I am providing this plan because I remain committed to California families and to the continued viability of our operations here — not because I accept the characterization of this memo as an accurate account of the circumstances.

For the record, I also note that this memo arrived two days after a settlement offer was extended to Ryan and me regarding our ownership interests. The timing, the removal of our weekly meetings, and the withdrawal of office resources have not gone unnoticed. I am raising these concerns here because they are material to any fair evaluation of CA operations and a path to profitability for these operations.

**Corrections to the Factual Record**

**Budget and Resource Allocation**
I have had no control over budget creation or allocation for California operations. Those decisions have been made unilaterally at the company level. During the period covered by this memo, the company elected to expand into new states, fund travel for international business development, and open centers in other markets — including historically unprofitable regions — while reducing the marketing budget and resources available to California. I raised these allocation concerns in our ongoing operational discussions and was not given a satisfactory explanation for the disparity other than claims that California is unprofitable, ignoring continued investments into regions that have been more unprofitable for a longer period of time, and to a much higher degree. This was confirmed by Matt's financial reports produced before and during document production requests last year, yet California has been used as a scapegoat for much larger structural issues at Acclaim. Nevertheless, I remain committed to making sound management decisions under the circumstances, even though previously committed resources and relief continue to be withheld.

**The Center-Based Services Decision**
Through November 2025, leadership discussions reflected a shared understanding that a physical center in California was the appropriate and necessary solution to the growth challenges we face here. Two years of waitlist and demand data — gathered through outreach, intake processes, and community relationships — consistently show that the majority of families seeking services in this market require center-based intensive programming. Many of those families cannot be served in a home or community setting due to the nature and severity of their child's needs.

The decision to withdraw the commitment to a center was not made by Ryan or me. Withdrawing that commitment while simultaneously holding me accountable for the resulting performance gap is not a reasonable standard. I cannot endorse this framing, but I am nonetheless providing a plan within the constraints as stated.

**Operational Support**
On the day this memo was sent, I was removed from all forward-looking calendar invites. I have also been informed that the company will no longer fund the California office space and that we are delinquent on payments for space used for interviews, training activities, credentialing, licensing, and other key activities necessary for compliance and ongoing operations. Taken together, these actions remove the basic infrastructure — coordination, access, physical workspace — that any plan to improve performance requires. I am noting this formally because it creates a direct conflict with the memo's stated goal of improving operational outcomes.

You also mentioned Ryan's involvement in CA operations. This is an overstatement. Ryan looks at the data and marketing efforts, confirmed that center-based services were appropriate based on the waitlist and marketing data, and reduced marketing waste due to click fraud. You had meetings with both of us where we discussed this and all mutually agreed that center-based services were appropriate for this market, followed by an expansion of service lines, and these conversations continued through November of last year until it was clear unilateral changes were being made to the CA budget and strategy against the feedback of the entire team. This is the same strategy we all agreed to in 2024, and data still indicates that it is the correct path forward for profitable operations in CA. You certainly were aware of these suggestions and affirmed them to both of us various times over the past year until Ryan raised concerns that were validated through document production.

**Prior Guidance and Feedback**

I have received no prior written warning, performance improvement plan, corrective action notice, or formal feedback indicating that my performance was deficient prior to Ryan's raising of issues last year. Suddenly, my access and reports were removed and my resources to execute were reduced. My emails and activity are being monitored by you, yet no guidance was provided that would actually work toward a more healthy operational environment in CA. This memo is the first formal documentation of any performance concern, and it arrives in the context of an active fiduciary and shareholder dispute — not as part of a good-faith performance management process.

**Operational Plan: California Growth Strategy**

The following plan addresses each element of your February 27 request. It is built within the stated constraints of no additional capital investment. Again, this goes against all waitlist and client demand data we have, while other historically unprofitable locations receive funds that are being denied to California operations. I am not able to guarantee outcomes that depend on resources the company has declined to provide, but I will operate in good faith toward the targets that are achievable within these conditions. Furthermore, the additional 5% of the company owed to me was based on an understanding that we would pursue center-based services in CA, which seems to be a major reason why California's resources are being targeted while other unprofitable regions continue to receive resources despite historic unprofitability. It should also be noted that regions where center-based services are dominant became more profitable because they have a center.

1. Near-Term Path to 150 Weekly Billable Hours (0–90 Days)
Current weekly hours: 70–110. Gap to target: 40–80 hours. The following actions can be executed within existing budget:
• Waitlist activation. CA maintains an active waitlist of families seeking services. Prioritizing intake for families whose service needs can be met in home or community settings — without a center — is the fastest path to additional billable hours. Estimated impact: +20–35 hours per week within 30–60 days, subject to RBT staffing availability. We are currently supporting existing families and onboarding new families, and most of the waitlist clearly shows a preference for center-based activities. There is no control over this client preference.
• Authorized hours utilization. Some current clients hold insurance authorizations for more hours than they are receiving. I will work with families to increase session frequency for those who can accommodate it. Estimated impact: +5–10 hours per week, but this is dependent upon variables outside of my direct control. This has always been a target tactic, but it needs to be stated here for completeness.
• LCSW and expanded billing codes. A full funder analysis to determine LCSW-eligible codes is required. Credentialing an LCSW does not require capital expenditure beyond licensing fees. This opens a new service line and revenue stream, but without center-based services, the impact will be limited. It can start with a new LCSW or one of our existing PA LCSWs to the extent the law permits, but I do not control the timeline and we would be more successful with expanded service lines in a center-based environment. Without access to an office at all, it is not possible to properly oversee and train clinical staff under the circumstances.

Constraint: The removal of office access and operational meetings limits any ability to coordinate intake, onboarding, and scheduling efficiently. Reinstating basic operational infrastructure is necessary to execute this plan at the pace the March 6 timeline implies. This assignment, under the current constraints, seems to be for the purpose of constructive sidelining and termination rather than a good faith attempt to make a sustainable operational footprint in CA.

2. Timeline to 300 Weekly Billable Hours (3–6 Months)
Reaching 300 hours per week from a home/community-based model alone is structurally difficult and will require sustained effort across several workstreams. The following plan is realistic under favorable conditions; it assumes that referral pipelines are functional, that RBT recruitment succeeds, and that operational meetings are restored.
• Month 1–2: Continue to activate waitlist, recruit 1–2 per-diem RBTs. Target: 130–150 hours/week.
• Month 3–4: Regional center (DDS) has completed their Rate Reform Initiative and is accepting applications from new providers again, expand school-age services through school district partnerships. Target: 180–220 hours/week. Note that all regional center providers have physical centers, so our ability to recruit without office space or a center puts us at a competitive disadvantage.
• Month 5–6: Recruit additional clinical staff contingent on revenue growth, optimize insurance authorization processes. Target: 250–300 hours/week.

I want to be direct: sustaining 300 hours per week in a home/community model, without a center, will be difficult to maintain. The data gathered over two years consistently shows that a significant portion of our waitlisted families need center-based intensive services that cannot be delivered in a home setting. Reaching 300 hours on a durable basis will likely require revisiting the center investment decision. I am documenting this not as a refusal to work toward the target, but as an honest operational assessment.

3. Staffing and Recruitment Plan
Within the constraint of no additional capital investment, the following staffing approach minimizes fixed cost while building capacity:
• Per-diem RBTs. Continue to recruit part-time behavior technicians through university programs and ABA-specific platforms. Per-

diem structure avoids benefits costs and allows flexible scaling.
• LCSW. Credentialing an LCSW for a supplementary service adds a revenue stream that does not compete with ABA billing and can be done with a part-time or contracted provider initially.

4. Client Acquisition and Retention Strategy
• Waitlist conversion. Highest priority, zero acquisition cost. I will continue to review the existing waitlist for non-center-based service needs.
• Regional Center (DDS). Continuing to build relationships with our regional DDS office strengthens a referral pipeline that is publicly funded and does not require marketing spend. This is a new channel based on recent communications from the Regional Center offices.
• School district partnerships. School-age ABA services and IEP-related assessments are a growing referral source in CA. District partnerships can generate consistent referrals at low cost.
• Google Business and online presence. Optimizing our California-specific online presence is a no-cost or minimal-cost effort that meaningfully improves inbound inquiry volume. Marketing is working on this.

5. Projected Timeline to Break-Even
At 150 hours per week, we may be profitable if collections are sound. Whether this achieves break-even depends on the fixed cost structure that the company controls — including staff compensation, office or space costs, and allocated overhead. I am requesting a current P&L and cost allocation report for California operations, and for all other regions, so I can model break-even accurately and understand the narrative why California is being targeted compared to other previously documented regions experiencing unprofitability.

Based on my understanding of CA operational costs, a lean structure at 150 hours per week should approach break-even. At 200–250 hours per week, CA operations should be cash-flow positive. I can provide a more detailed projection once I have current financial data. Please provide whatever is available.

**Closing**

I am providing this plan in good faith, but I want to be clear: the conditions under which it is being requested are not conditions that reflect a sincere commitment to CA's success. A plan requiring improved performance while simultaneously removing office access, cancelling operational meetings, and withdrawing funding commitments that were previously made is not a good-faith performance improvement process.

I continue to support our California families and am meeting our obligations to clients and insurers to the best of my ability under these circumstances. I remain open to a genuine conversation about how to make California operations sustainable — including revisiting the center investment decision that was repeatedly discussed and committed to before this dispute began.

Please confirm receipt of this plan and provide the financial reporting data requested above.

Thank you,
Cyn

On Fri, Feb 27, 2026 at 9:17 AM Jamie Turner <jturner@acclaimautism.com> wrote:

Cyn,

This memo formally documents the performance benchmarks previously established for our operations in CA and initiates a structured review of operational and financial sustainability.

On April 8, 2025, a target of 300 weekly billable hours was established for CA operations to achieve by the end of 2025. On July 11, 2025, a benchmark of 500 sustained weekly hours for one month was set as the threshold for eligibility for an additional 5% ownership interest.

On November 26, 2025, leadership discussions reflected that approximately 150 weekly billable hours would represent a minimum threshold toward financial viability for CA operations.

Since those benchmarks were set, actual weekly performance has generally ranged between approximately 70–110 billable hours. As a result, CA operations have continued to operate at a financial loss.

The financial position of CA operations has been previously documented and shared. The year-to-date P&L through August 31, 2025 reflected sustained losses in CA and was circulated in September 2025 when Ryan claimed he was assisting with CA operations. At that time, we discussed the possibility of shutting down CA operations if financial performance did not materially improve. Those discussions were based solely on financial sustainability considerations.

Further, as early as March 2024, we established a plan to expand services to include additional billing codes, including LCSW services, with the goal of moving toward a more comprehensive, one-stop-shop provider model prior to investing in a physical center. That expansion has not been implemented to date.

At this time, the company will not invest additional capital into a center or other expansion efforts until CA operations are financially sustainable. Accordingly, any proposed plan must be operationally feasible without requiring additional company investment.

Given the sustained gap between documented benchmarks and actual performance, and the ongoing financial losses, the company must now formally evaluate whether CA operations in their current state are viable.

Please provide no later than March 6, 2026, a written plan that includes:

• A detailed strategy to reach at least 150 weekly billable hours in the near term
• A measurable timeline toward the previously established 300-hour benchmark
• A staffing and recruitment plan within existing financial constraints
• A client acquisition and retention strategy
• A projected timeline to break-even without additional capital investment

This review is focused solely on operational performance and financial sustainability. If CA operations cannot demonstrate a realistic and measurable trajectory toward sustainability within existing constraints, the company will need to reassess the structure of CA operations, including leadership roles associated with them.

Please let me know if you need financial reporting data to complete your plan.

Jamie


--
**Jamie Turner, MBA, PMP, BCBA** (Pronouns: he / him / his)
President
Acclaim Autism
We're Hiring!  Check Out Our Postings



888-805-8206

jturner@AcclaimAutism.com

www.AcclaimAutism.com

2929 Arch St, Suite 1700, Philadelphia, PA, 19104

# EXHIBIT "I"

**ACCLAIM AUTISM**

# Request for Information – CA PHI

**Jamie Turner** <jturner@acclaimautism.com>                                    Thu, Mar 26, 2026 at 10:00 AM
To: Cynthia Lin <clin@acclaimautism.com>
Cc: "kaminsky.esq@gmail.com" <kaminsky.esq@gmail.com>

Hi Cyn,

Thank you for confirming that you will proceed with the steps required to secure the PHI.

Please proceed with scanning the materials on-site at the Industrious location, as you suggested. The materials should remain at the location until they are digitized and uploaded to Acclaim's approved systems.

You are authorized to purchase a printer/scanner and any necessary supplies to complete this work, with a budget of up to $200. You may also arrange for the HIPAA-compliant destruction of the physical records following successful upload and verification.

Please continue to move forward with the outlined steps and timeline, with completion by April 9, 2026.

If you have any questions related to expenses, please contact finance@acclaimautism.com.

The company's position regarding the Industrious space has already been communicated and remains unchanged.

Thanks,
Jamie

On Wed, Mar 25, 2026 at 9:28 PM Cynthia Lin <clin@acclaimautism.com> wrote:
> Jamie,
>
> I completely disagree that this constitutes a breach of my agreement or a failure to secure and properly maintain PHI consistent with company requirements. As I previously wrote, this resulted solely from Acclaim's failure to honor the lease obligations it undertook on behalf of Social Services Squad, and refusal to cure the non-payment default after receiving notice of the same.
>
> Nevertheless, to avoid dispute, I am agreeable to make best efforts to cure the alleged breach via the method you proposed. I am willing to:
> - Scan and upload all physical client files and PHI currently at the Industrious location into Acclaim's approved systems (Appian, CentralReach, Google Drive, as applicable)
> - Provide a complete inventory of all files processed
> - Arrange for HIPAA-compliant destruction of all physical records following verification of successful upload. This will likely require engaging another vendor and securing a BAA since Acclaim employees would no longer have control over the documents.
>
> However, due to nonpayment of lease obligations, I must expressly ask if you plan to maintain my access to the space, and note that our access to other resources at the location have been restricted due to nonpayment.
>
> To ensure that the scanning and upload of materials can be accomplished, I am willing to purchase a scanner and scan all of those documents into folders on my company computer. There are two ways to achieve this, I can either try to walk into the space with a scanner and scan them at the space, or retrieve the materials, take them to my house, and scan them at my house. I do not advise the latter since materials should remain stored in the company's space. Once scanned, I will upload all the materials to Acclaim's approved systems and arrange for destruction of the physical records.
>
> I do not own a scanner, so please confirm that I can utilize the company card to purchase the scanner, connection wires, and the fee for HIPAA-compliant destruction of all physical records. Let me know whether you prefer I bring a scanner to the space or retrieve the materials and scan them at my home. Once I hear from you, the above steps will be accomplished as soon as practicable, and no later than 5:00 PM PT on April 9, 2026.
>
> Note that Industrious was not accessible to conduct Safety Care Training on Friday, March 13, due to nonpayment. We secured another conference room based on your recommendation. The $360 invoice from IVO for the conference room fee, submitted via Ramp on March 13, is still outstanding for your review.
>
> Thank you,
> Cyn
>
> On Wed, Mar 25, 2026 at 10:02 AM Jamie Turner <jturner@acclaimautism.com> wrote:

Hi Cyn,

I am writing to formally address the Protected Health Information (PHI) and client records currently stored at the Industrious workspace in Irvine, California. You previously confirmed that PHI is present at that location. As Compliance Officer, I have an obligation to ensure that all PHI is properly secured in accordance with company requirements and applicable regulations.

At this time, PHI remains stored outside of Acclaim's approved systems, and required corrective action has not yet been completed.

Under your employment agreement, you are required to comply with company policies and perform assigned duties in a manner satisfactory to the company. The failure to secure and properly maintain PHI consistent with company requirements constitutes a breach of these obligations.

Opportunity to Cure (15 Days):

You are hereby directed to take the following actions:

- Scan and upload all physical client files and PHI currently at the Industrious location into Acclaim's approved systems (Appian, CentralReach, Google Drive, as applicable)
- Provide a complete inventory of all files processed
- Arrange for HIPAA-compliant destruction of all physical records following verification of successful upload

These actions must be completed no later than 5:00 PM PT on April 9, 2026.

I have confirmed with Industrious management that you are able to access the suite to retrieve these materials.

Please confirm by 5:00 PM PT on March 26, 2026 that you will proceed with these steps. If you are unable or unwilling to complete these actions, the company will take alternative steps to secure these materials, including arranging for a Pennsylvania-based staff member to travel to California to retrieve and secure the records.

If this issue is not cured or substantially addressed within the 15-day period, the company may proceed with termination of your employment for cause.

Thanks,
Jamie
President & Compliance Officer
Acclaim Autism

On Mon, Mar 23, 2026 at 12:25 PM Jamie Turner <jturner@acclaimautism.com> wrote:

> Hi Cyn,
>
> Thank you for the response.
>
> To clarify, my request is limited to confirming the status of any Acclaim client-related materials at the Industrious location so that I can ensure they are appropriately secured.
>
> Given the urgency of this matter, I will proceed with securing and reviewing any materials at the location directly to ensure compliance.
>
> I will coordinate next steps accordingly.
>
> Thanks,
> Jamie
>
>
> On Mon, Mar 23, 2026 at 11:37 AM Cynthia Lin <clin@acclaimautism.com> wrote:
>> Jamie,
>>
>> Thank you for your message. To clarify the record directly:
>>
>> My only communications with Industrious thus far have been to obtain copies of the membership agreement and related documents so that I could better understand the company's obligations under the lease. Those inquiries were made in good faith, and the information obtained was raised through appropriate  channels. No other communications with Industrious regarding access, retrieval, or relocation of materials have taken place.
>>
>> I want to be direct about something that has come as a complete surprise to me. The decision to discontinue funding for this lease was made unilaterally, without input from California leadership, and without any plan for the orderly transition of key regulatory requirements that depend on this address. Acclaim's California business license is tied to this location. The space houses HIPAA-compliant client materials with no viable alternative storage in California. No transition plan, alternative location, or operational continuity plan was provided before or after this decision was made. These are not minor

administrative details. They are foundational compliance and licensing obligations that affect the company's ability to operate legally in the State of California.

No viable alternatives for the storage of these materials exist in California at this time. I cannot retrieve or relocate the materials without exposing myself to personal liability because I cannot ensure compliance, nor can I protect the company from liability due to its officers' current course of action without a lawful alternative in place.

The path to resolving this is straightforward and has been stated repeatedly. Please confirm that the Industrious lease has been brought current and that access to the space has been restored. If you are unwilling to do so, please communicate directly with my legal counsel regarding this matter to discuss alternatives that do not expose me or the company to liability.

Our objections to this decision are on record as shareholders. The decision appears to have been made without consideration of the company's California licensing obligations, HIPAA compliance requirements, or operational continuity needs — all of which were foreseeable consequences that could have been avoided with basic due diligence before discontinuing payment on a committed operational expense.

Continuing to send compliance demands with same-day deadlines and no ways to lawfully resolve the issues created by the company's officers is not an appropriate use of the compliance review process. A solution to the problem you have described exists. It requires only that Acclaim honor the commitment it made when the current lease was signed after your approval.

Please be advised that legal counsel is copied on this message.

Thank you,
Cyn

On Mon, Mar 23, 2026 at 5:01 AM Jamie Turner <jturner@acclaimautism.com> wrote:
Hi Cyn,

Thank you for the additional context.

To clarify, this request focuses specifically on the status and handling of client-related materials — not general access to the workspace.

As part of our compliance review, I need documentation of any efforts made to access, retrieve, or secure these materials.

Please provide:

- Copies of any communications with Industrious (or any other party) regarding access to, retrieval of, or storage of these materials
- Confirmation of whether any requests have been made to retrieve or secure the materials to date
- If no such efforts have been made, please confirm that as well.

Separately, please confirm what would be required specifically to retrieve the materials (as distinct from general use of the workspace).

We need to ensure we have clear documentation of the status and handling of these materials.

Please respond by 11:00 AM PT today.

Thank you,
Jamie

On Fri, Mar 20, 2026 at 6:33 PM Cynthia Lin <clin@acclaimautism.com> wrote:
Jamie,

Thank you for your message. I want to address your questions directly, but first I need to correct several factual and legal premises that are material to the compliance analysis you're describing.

**On HIPAA and Industrious's role**

Industrious is not a business associate under HIPAA, and no Business Associate Agreement with Industrious is required or appropriate. Industrious is a licensor of private office space. Under our membership agreement, Social Services Squad holds a dedicated private office with 24/7 exclusive access. Industrious does not access, handle, or have custody of any materials stored within that office. HIPAA's business associate requirements are triggered when a third party accesses or handles protected health information — not merely when a company leases office space in which records happen to be stored. There is no HIPAA violation present, and there would not be one unless Industrious were to take physical custody of the materials — a risk that would only arise if the membership agreement were terminated and materials were abandoned in the space.

**On the nature of the materials and regulatory obligations**

The materials stored at this location include physical clinical documents provided by families, correspondence with insurance companies, communications from regulators, and related information that is distributed and maintained in physical form — as is standard practice in every clinical market in which we operate. This is precisely the category of records that must be maintained in accordance with applicable regulations governing our business, including HIPAA, and it is one of the primary reasons a dedicated private office was pursued for Acclaim rather than a shared or open coworking arrangement. The decision to secure a private, access-controlled office was made deliberately and with appropriate compliance considerations in mind.

I will visit the space next week and can provide an inventory of the exact number of clients impacted at that time. I have maintained these materials in accordance with the law and with your full awareness as Chief Compliance Officer.

**On the relationship between Social Services Squad and Acclaim Autism**

No Business Associate Agreement between Social Services Squad and Acclaim Autism is required because the two entities share identical employees and officers. At no point has any person associated with Social Services Squad who is not also an employee of Acclaim Autism had access to the file cabinet or the materials stored within it. Under HIPAA, workforce members acting within the scope of their duties for a covered entity do not trigger business associate obligations. The personnel overlap here is complete, and HIPAA compliance has been maintained throughout.

**On the history and authorization of these arrangements**

These arrangements were not established without the Company's knowledge or approval. The invoices associated with Social Services Squad were reviewed, approved, and paid with your authorization as part of normal company operations. You personally visited our Pasadena Industrious location in 2024, were directly present in the office, and were aware of exactly how the space was being used, what materials were maintained there, and the full operational setup — including the file cabinet in which you stored your own personal laptop. At no time during or after that visit did you raise any compliance concern. The current Irvine location operates under the same arrangements that you reviewed, approved, and personally participated in.

**On your obligation as Chief Compliance Officer**

As President and Chief Compliance Officer of the Company, you are most certainly aware of these obligations since you visited an office with the same configuration and security during your previous visits to California. I want to be clear: our raising of this matter as shareholders is not an attempt to create a compliance problem. It is an attempt to ensure that you, the finance department, and Acclaim Autism as a company do not create one — and that notice has now been formally provided to you for that purpose.

**On the actual compliance risk — and how to avoid it**

The sole scenario under which a genuine HIPAA risk would materialize is if Acclaim loses access to the Industrious space due to non-payment of the membership agreement. We have only recently been made aware of your intent to cancel or discontinue that arrangement. The fix is straightforward: we strongly recommend that the lease be brought current and maintained through its term, as was agreed upon prior to the signing of the agreement. Continued payment of the office space would fully resolve any concern about the security and accessibility of client materials stored there. The compliance risk is not one we have created — it is one that can be avoided by honoring the commitment that preceded the current lease historically paid by Acclaim. Allowing that commitment to lapse would constitute an intentional act with foreseeable HIPAA consequences, and formal written notice of that risk has now been provided.

The materials are currently secure, held in a private dedicated office accessible only to Acclaim Autism employees. That is the status I can confirm, and I will provide a full client inventory following my visit next week.

Thank you,
Cyn

On Fri, Mar 20, 2026 at 1:32 PM Jamie Turner <jturner@acclaimautism.com> wrote:
> Hi Cyn,
>
> Thank you for confirming the materials are currently secured. As part of our compliance review, I need to gather additional documentation related to the storage and handling of any client-related materials at the Industrious location.
>
> Can you please provide:
>
> - A brief description or inventory of the currently stored materials (including material types, approximate # of clients impacted, etc.)
> - Any documentation or agreements in place related to the storage of these materials at Industrious and/or through Social Services Squad, including any Business Associate Agreements (BAAs) or similar arrangements
> - Copies of all prior communications or efforts related to accessing, retrieving, or relocating these materials.

In addition, please confirm what arrangements would be required to retrieve and relocate these materials if needed based on the communications you've had with Industrious.

Given the importance of maintaining appropriate oversight of client information, please provide this by 5:00 PM PT today.

Thank you,
Jamie

On Fri, Mar 20, 2026 at 4:04 PM Cynthia Lin <clin@acclaimautism.com> wrote:
Jamie,

Thank you for your email. The materials in question are stored in a locked room within a locked cabinet at the Industrious workspace, in full compliance with HIPAA requirements. No PHI is currently at risk.

However, that could change. If the lease remains unpaid and access to the space is lost, Acclaim will face a serious and avoidable HIPAA compliance problem. No alternative storage exists in California for this physical documentation. The compliance risk you are referencing was created entirely by Acclaim's unilateral decision to discontinue funding a lease it formally committed to through an approved budget, without shareholder input, approval, or any alternative plan in place.

Restoring payment to the Industrious lease resolves the compliance concern immediately.

I have forwarded this matter to legal counsel and will respond further through appropriate channels to ensure everything is properly documented. I think it would be best for you to communicate directly with Industrious regarding this matter to avoid any confusion or delay.

Thank you,
Cyn

On Fri, Mar 20, 2026 at 7:28 AM Jamie Turner <jturner@acclaimautism.com> wrote:
Hi Cyn,

I received a report indicating that physical materials potentially containing client information may be present at the Industrious workspace in Irvine. As part of our compliance responsibilities, and my role as Compliance Officer, I need to confirm the status of this as soon as possible.

Can you please confirm:

- Whether any Acclaim materials containing Acclaim current or former client PHI are currently located at the Industrious space
- If so, what types of materials are present
- Whether any steps have already been taken to secure or remove those materials

Given the importance of this matter, please respond by 3:00 PM PT today.

Thank you,
Jamie

--
**Jamie Turner, MBA, PMP, BCBA** (Pronouns: he / him / his)
President
Acclaim Autism
We're Hiring!  Check Out Our Postings

 **ACCLAIM AUTISM**

---

888-805-8206

jturner@AcclaimAutism.com

www.AcclaimAutism.com

2929 Arch St, Suite 1700, Philadelphia, PA, 19104

# EXHIBIT "J"

  **ACCLAIM AUTISM**

2929 Arch St, Suite 1700
Philadelphia, PA 19104

(888) 805-8206
(855) 936-1282

www.AcclaimAutism.com
info@AcclaimAutism.com

## NOTICE OF ANNUAL MEETING OF SHAREHOLDERS

To the Shareholders of Aspire Autism Inc. d/b/a Acclaim Autism

Notice is hereby given that a Special Meeting of Shareholders of Aspire Autism Inc. d/b/a Acclaim Autism, a Pennsylvania corporation, (the "Company") will be held on **April 28, 2026** at **3:00pm ET**, virtually by Google Meet, for the following purposes:

1. To elect director(s) to serve until the next annual meeting and until their successors are elected and qualified.
2. To discuss and vote on revisions to the Bylaws, with revisions attached to the meeting notification.
3. To discuss and vote on the draft Shareholder Agreement, a copy of which is attached to the meeting notification.
4. To discuss compliance matters that have been addressed, or are being addressed, since the last shareholder meeting.
5. To transact such other business as may properly come before the meeting or any adjournment thereof.

Only shareholders of record at the close of business on **April 20, 2026** are entitled to notice of and to vote at the meeting.

In accordance with Sections 2.03(a) and 3.03 of the Company Bylaws, this notice is being given at least ten (10) days before the meeting date. A meeting link is being sent to your email address. If you don't receive this by April 25, 2026, please contact jturner@acclaimautism.com

By Order of the Board of Directors,

Jamie Turner

Sole Board Member

# EXHIBIT "K"



**Anton Kaminsky, Esquire**
Licensed in PA & NJ
(215) 876 - 0800
Kaminsky.esq@gmail.com

April 27, 2026

**VIA EMAIL TO**: jturner@acclaimautism.com; mmcgrath@acclaimautism.com
Aspire Autism Inc. d/b/a Acclaim Autism
Attn: Jamie Turner and Matt McGrath
2929 Arch Street, Suite 1700
Philadelphia, PA 19104

**Re:**     **OBJECTION TO MATTERS TO BE DISCUSSED AND VOTED ON AT THE
APRIL 28, 2026 ANNUAL MEETING OF THE SHAREHOLDERS**

Dear Mr. Turner,

As you are aware, my office is counsel for Ryan Cox ("Mr. Cox") and Cynthia Lin ("Mrs. Lin") (collectively the "Minority Shareholders") owning 10% and 5% of Aspire Autism Inc. d/b/a Acclaim Autism ("Acclaim" or the "Company") and collectively owning 15% of Acclaim.  I write to the Corporation directly for notice purposes pursuant to the Business Corporation Law, 15 Pa.C.S. § 1101, *et seq*. (the "BCL") in furtherance of the November 28, 2025 Demand the Minority Shareholders made on Acclaim ("November Demand") and to formally object to the matters to be discussed and voted on at the April 28, 2026 Annual Meeting of the Shareholders (the "Annual Meeting").  The Minority Shareholders request that this correspondence be circulated to all shareholders of record and included in the minutes of the Annual Meeting.

The Minority Shareholders object to the following proposed actions as they appear to be done in response to their objection to Jamie Turner ("Mr. Turner")'s self-interested conduct as the majority owner of the Company and specifically intended to create a path to remove the Minority Shareholders' say and vote as it pertains to matters in which Mr. Turner is personally interested. The Minority Shareholders also believe that the proposed amendments are a thinly veiled attempt to allow the Company to expel them without payment of fair market value—or any value, and constitutes shareholder oppression as it is defined in the BCL and by Pennsylvania jurisprudence.

### Objection to Proposed Shareholder Agreement

The Minority Shareholders expressly object to the proposed shareholder agreement (the "Proposed SA"), which imposes new terms and restrictions on their shares that were never discussed, proposed, or agreed upon at the time the Minority Shareholders' shares were issued and granted to them.  By way of limited example only, Section 3(B)(iii) of the Proposed SA *requires* Mr. Cox, who has already been terminated from the Company, without cause, to offer his shares for sale to the Company. In fact, pursuant to Section 3(E)(i) of the Proposed SA, Mr. Cox would forfeit his shares to the Company "zero dollars ($0)" irrespective of the fact that he was terminated without cause. This is a direct alienation of his rights, is backwards looking, was not contemplated when he was awarded his shares. The Proposed SA also provides for various other means to force the Minority Shareholders to sell and/or for the Company to dilute their interests that were not present or available under the existing Shareholders Agreement and BCL.  Under the BCL, 15

**Bucks County**
207 Buck Rd., Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
April 27, 2026
Page **2** of **3**

Pa.C.S. § 1529(b), these types of restrictions would not be binding against the Minority Shareholders any attempt to impose or enforce them constitutes blatant shareholder oppression.

By way of additional limited example only, the Section 5 of the Proposed SA seeks to ratify the unresolved dispute about Mr. Cox' improper removal from the board of directors. As previously detailed in countless correspondence, at all times relevant hereto, Mr. Cox was a member of the board of directors and the treasurer of the Company. However, as soon as he began raising issues with Mr. Turner's improper and unilateral conduct, he was improperly removed from the board and his duties as treasurer were revoked. This conduct was improper and a breach of Mr. Turner's fiduciary duty to the Minority Shareholders and the Company. Mr. Turner's attempt to ratify such conduct via a new shareholder agreement further substantiates the shareholder oppression to which the Minority Shareholders are being subjected.

As further evidence of oppression—and not as an exhaustive list—the Proposed SA seeks to waive the conflict of interest that Lamb McErlane, P.C. clearly had as counsel for the Company when it prepared a new shareholders agreement that obviously favors Mr. Turner, the majority shareholder, while blatantly oppressing the Minority Shareholders. The Minority Shareholders refuse to waive any rights or remedies that they might have arising from such conflict and expressly reserve any and all rights and claims.

Accordingly, for these reasons and various others that are not expressly spelled out herein, the Minority Shareholders object to the Proposed SA in its entirety. They also reject any attempt to impose restrictions on their shares that did not exist when those shares were issued and granted to them as they violate the BCL, are oppressive, and frustrate the Minority Shareholders reasonable expectations as shareholders in a closely held corporation. Such conduct could also be grounds for the Minority Shareholders to seek the appointment of a custodian under 15 Pa.C.S. § 1767(a)(2) and are expressly notifying Mr. Turner and the Company of the same.

### Objection to Modification of Section 3.05 and 4.01 of the Bylaws

Section 3.05 of the Bylaws currently requires that a disinterested vote of the shareholders occur for any transaction in which a shareholder may be interested. Similarly, 4.01 of the Bylaws places a substantial amount of discretion in the board of directors—which also limits certain types of conduct by interested board members. In their November correspondence to the Company, the Minority Shareholders sought business records and objected to certain transactions and conduct in which they contend the majority shareholder and board member, Mr. Turner, was personally interested and from which he received a disproportional benefit. In response, Mr. Cox was terminated, removed from the board of directors, and Mrs. Lin was deprived of her access and duties—in an obvious attempt to create a roadmap for her termination. However, the Majority Shareholders still maintained their ability to object to such conduct and transactions and for which the Company had to hold a disinterested vote. The proposed amendment to the Bylaws seeks to eliminate that ability. The Minority Shareholders contended the same to be in direct response to their voiced objections and concerns. The Minority Shareholders further maintain that the same is a thinly veiled attempt to oppress Mr. Cox's objections as a member of the board and both of their rights as minority shareholders.

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

**KAMINSKY LAW, LLC**
April 27, 2026
Page **3** of **3**

### Objection to Modification of Section 3.08 of the Bylaws

The proposed addition of Section 3.08(e)—combined with the terms set forth in Proposed SA which requires a shareholder that is terminated from the Company to sell their shares—appears designed specifically to remove Mr. Cox, then exclude him from acting as a proxy for his wife, Mrs. Lin. Again, this is an objectionable change as it is a thinly veiled effort to unilaterally impose new restrictions on the Minority Shareholders' ownership and rights of ownership of the Company that were never in place when they received their shares.

### Shareholder Oppression

As a whole, the Minority Shareholders contend that the Company failed to adequately respond to their November 5, 2025 demand for records, their November Demand on the Company and maintain that Mr. Cox' termination, Mrs. Lin's reduction of access and duties, and this proposal to amend the Bylaws and enter into the Proposed SA constitutes shareholder oppression under the BCL, under applicable Pennsylvania jurisprudence. The Minority Shareholders are placing Mr. Turner and the Company on notice of the same and expressly reserve any and all rights and claims.

Nothing in this correspondence is intended as a waiver of any arguments and the failure to identify specific issues with the Company's conduct, Mr. Turner's conduct, the Proposed SA and/or the Bylaws revisions is not a waiver of the same—all of which are expressly preserved.

Thank you for your prompt attention to this matter.

Sincerely,

**KAMINSKY LAW, LLC**

Anton Kaminsky, Esquire

**CC VIA EMAIL TO**: jcunningham@lambmcerlane.com; sparekh@lambmcerlane.com; jfrank@lambmcerlane.com
**Lamb McErlane, P.C.**
Sonal Parekh, Esq.
Joel Frank, Esq.
John J. Cunningham, IV, Esq.

**CC VIA EMAIL TO**: ryecox@gmail.com; himynameiscyn@gmail.com
Ryan Cox
Cynthia Lin

**Bucks County**
207 Buck Road, Suite 2
Southampton, PA 18966

Ph: (215) 876-0800
Fax: (844) 888-0530
www.KaminskyLaw.com

**Philadelphia**
1601 Lombard Street, Suite 2A
Philadelphia, PA 19146

# EXHIBIT "L"

Aspire Autism, Inc. d/b/a Acclaim Autism

May 19, 2026

***By Federal Express Overnight Delivery***

Cynthia Lin
117 Sora
Irvine, CA 92618

Re: Notice of Termination of Employment Effective December 15, 2026

Dear Cynthia:

This letter serves as formal notice that Aspire Autism Inc. d/b/a Acclaim Autism ("Company") is terminating your employment pursuant to Section 2(a) of the Part-Time Employment Agreement by and between the Company and you, dated December 15, 2021 (the "Agreement").

In accordance with Section 2(a) of the Agreement, termination shall be effective at the end of the current term, December 15, 2026 (the "Termination Date"). As of the Termination Date, your employment with the Company shall cease in all respects. This termination applies to all roles and capacities in which you serve or may serve with the Company, to the extent applicable.

Effective May 31, 2026, you shall no longer have access to the Company's office premises, systems, or property, or any office location funded by the Company. You are directed to cease performing work effective May 31, 2026, and to promptly return all Company property, including but not limited to keys, access devices, documents, records, equipment, and any other assets belonging to the Company, in your possession, custody, or control. You may use your company-provided corporate credit card to purchase shipping for the company-issued Mac computer and any other equipment or devices referenced above in your possession. These must be returned promptly following the May 31, 2026 date. They may be shipped to: Aspire Autism Inc. 419 N Franklin St STE 2, West Chester PA 19380. The company credit card is to be used for reasonable shipping costs only and for no other purpose moving forward.

You shall comply with all of your responsibilities and obligations to the Company, including but not limited to the non-solicitation, confidentiality, and no-public-announcement obligations set forth in Sections 7(b) and 9 of the Agreement. Any remaining rights and obligations of the parties shall be governed by the terms of the Agreement and applicable law.

Please direct any questions regarding logistics related to the return of Company property to Jamie Turner, President.

Sincerely,

_____
Jamie Turner, President
Aspire Autism Inc. d/b/a Acclaim Autism